

FILED

2015 MAY 29  PM 12 50

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECATICUT

| | |
|---|---|
| Genevieve Henderson, <br> Plaintiff | Civil No. 3:13CV1415 (JBA) |
| vs | |
| Wells Fargo Bank, NA <br> Defendant | May 28, 2015 |

### AMENDED COMPLAINT

Pursuant to the Honorable Judge Arterton's May 7, 2015 order, the Plaintiff Amends her 12/3/14 Complaint and says:

### JURISDICTION

1. This is a Civil Action brought to this Honorable United States District Court of Connecticut, at New Haven, pursuant to 28 USC sec.1332, the Diversity Doctrine, as the Plaintiff is addressed in Connecticut and Defendant is a Corporation headquartered in the State of California and conducting business in this State.

### PARTIES

2. PLAINTIFF: Genevieve Henderson of 22 Lake Road, Middlefield, Ct. 06455, is and was at all times mentioned herein the owner and resident of her home for 30 years, and is the victim of fraudulent representations, Unfair Trade Practices, and other unethical, oppressive acts by Defendant.

3. DEFENDANT: Wells Fargo Bank, is and was at all times mentioned herein, a Corporation, duly organized under the Laws of the United States and/or without this State, doing business in the State of Connecticut as a Lending/Banking Institution, having acted with reckless indifference, and Methods, which caused Plaintiff substantial harm/injury.

## BACKGROUND

4. Plaintiff purchased and lived in her home since 1985, and refinanced it in 2008 with Wachovia Bank, which Defendant Wells Fargo, took over. In February of 2010, Plaintiff's mortgage was current and her pay-off was about $175,000 and according to Defendant, Plaintiff's home was valued at about $330,000.

5. On or about February of 2010, while Plaintiff was current and not in foreclosure with her mortgage, due to a drop in her income, she inquired about the Home Affordable Mortgage Program (HAMP), as well as a Reverse Mortgage from Defendant, Wells Fargo. She was encouraged to apply for the HAMP, which she did.

6. Several months after Plaintiff completed her HAMP application and was awaiting a decision, she called and inquired as to when she could expect Defendant's decision because she missed 2 payments while awaiting their decision. She was told there was no answer yet, but to make sure to make a mortgage payment to avoid foreclosure.

7. Plaintiff attempted to make a mortgage payment BEFORE the third payment was due, however, **Defendant REFUSED IT.**

8. **A)** **AS A DIRECT RESULT** of Defendant's refusal to accept Plaintiff's payment, Plaintiff was **FORCED into foreclosure WHILE STILL AWAITING the HAMP** approval (CV10-6003273).
   **B)** **WITHOUT Jurisdiction or Standing**, Defendant commenced their Foreclosure Action in August of 2010 **PRIOR** to the Mortgage and Note being assigned to them, when in fact, **IT WAS NOT ASSIGNED** to them **until October of 2011 (over 1 year later)** .

9. During the Mediation process, Plaintiff again asked for a Reverse Mortgage, and after Defendant's attorney verified that Wells still offered Reverse Mortgages, it was agreed by all parties that Wells would modify Plaintiff's Mortgage with a Reverse Mortgage.

   However, shortly after that agreement, Wells contacted Plaintiff and **induced her to abandon Mediation** with the promise that Wells had all the paperwork they needed to go forward with the HAMP and they would send the paperwork directly to underwriting with no further delays, stating that Plaintiff would not have to deal with Mediation or attorneys any longer.

10. **Based upon Defendant's representations**, Plaintiff abandoned Mediation in expectation of a speedy resolution/approval from underwriting.   **INSTEAD, when Mediation closed Plaintiff's file**, the delays and endless requests for paper-work started over again (and never ended).          3 of 13

About June of 2011, Plaintiff entered into contract with Defendant which included a 3-month trial payment plan in the amount of $304 per month to be paid to Defendant, and if successfully completed, Defendant would modify Plaintiff's mortgage.  Plaintiff did, in fact, SUCCESSFULLY complete the 3-month trial payment plan in September of 2011.

However, **Defendant BREACHED that contract,** ignoring Plaintiff's timely payments, and her requests for said modification, then just <u>acted as though it never existed</u>, when they had no valid reason for their actions.   And, the delay process continued, causing Plaintiff's **mortgage balance to increase,** and **her equity to decrease**.

11. Plaintiff sent several letters of COMPLAINT to John Stumpf, CEO of Wells Fargo, regarding the questionable practices Wells was using. Plaintiff was being subjected to constant delays, endless paper-work, and switching contact persons, all of which contributed to the excessive delays.   Defendant began back-dating letters to cover my complaints; their tactics were having an **unbearable affect on Plaintiff.**

12. April 3, 2012, when Plaintiff again wrote to Mr. Stumpf with the same complaints of Wells' questionable abusive practices Plaintiff endured for over 2 - 3-yrs, Mr. Stumpf's office named yet another contact person, a Ms. Cherry.

While speaking to Ms. Cherry on the phone and voicing my complaints, she reviewed Plaintiff's file and saw the amount of paperwork Plaintiff submitted, the number of years this went on, and how upset Plaintiff was, she acted genuinely sympathetic and reassured me she would correct it.   Since she was from Corporate, Plaintiff believed her.

However, it did not take long before she was dragging things out and made the same "unreasonable requests."   Whenever I questioned her about why I was in the same situation again, **she gave me no explanation.**

Finally, June 1, 2012, when Ms. Cherry asked Plaintiff for more documentation, Plaintiff was feeling the affects from it all and had an advocate respond, a Nicole Cameron.   The Advocate told Ms. Cherry she was looking at boxes of documentation (hundred of documents) Plaintiff faxed to Wells and questioned Ms. Cherry about **Wells' motives for such unreasonable requests.**

She told Ms Cherry this could go on forever, and how Defendant's unreasonable actions are affecting Plaintiff's health.   She asked Ms Cherry directly "**will this be the last request?**"   Ms. Cherry put the Advocate on hold to ask underwriting that question, and when she returned to the phone, she said "**this will be the last request.**"

However, on June 6, 2012, while Plaintiff was still awaiting a modification decision, **Ms. Cherry called to tell Plaintiff she was placed in "active foreclosure."** Plaintiff told Ms. Cherry she never received a notice of that, and since we were still awaiting a modification decision, Plaintiff asked why?   Ms. Cherry said **SHE DID NOT KNOW WHY.**

13. On June 14, 2012, Ms. Cherry called Plaintiff to say she DID NOT QUALIFY for the HAMP.   Plaintiff asked what interest rate they used, what term, and by what percent was the principal reduced by.   Ms. Cherry "hesitantly" said
    - Wells reduced the principal by 10%,
    - at interest rate of     5%
    - at term of     30-yrs

and she said **<u>Plaintiff did not qualify</u>**.   Plaintiff said that didn't sound like the right program.   And when Plaintiff questioned Ms. Cherry further, she sounded very uncomfortable and said Wells will be sending Plaintiff a denial letter.

At that point, Plaintiff asked Ms. Cherry to put the reasons she gave Plaintiff over the phone, IN WRITING, in their denial letter.   Ms Cherry said she had to get permission from underwriting first before she could do that.   HOWEVER, the denial letter came WITHOUT the information Ms. Cherry gave Plaintiff over the phone.

14. After Plaintiff received her denial letter, she contacted Defendant and asked why the modification was not calculated according to Hamp

    guidelines which are    a) reduce mortgage principal by up to 30%
                                     b) at 2% interest
                                     c) with a 40-yr term
                  (that Defendant never disputed)

Plaintiff also stated Defendant should have reduced Plaintiff's mortgage principal pay-off based on her 2010 mortgage pay-off of about $175,000 when Plaintiff applied for the HAMP (and WAS NOT IN FORECLOSURE)

Instead, **Defendant turned a 2 or 3 month modification, into a 36-month NIGHTMARE**, as well as the added harm of **INCREASING Plaintiff's mortgage pay-off** (by over $100,000 to date) and **DECREASING Plaintiff's EQUITY**.

15. Plaintiff has been fortunate to enjoy Good Health almost all of her life, and has never been on medication in her life, however, Defendant's above described conduct and tactics has inflicted a tremendous amount of stress, pain, and suffering on Plaintiff causing her blood pressure to increase to unsafe levels, and is now on Blood Pressure Medication. Plaintiff lived in her home for 30-yrs., however, the last 5-yrs. of her life has been a living nightmare; complying with every outrageous demand that Defendant made, because the alternative was so unthinkable.   After all that Plaintiff was subjected to, Defendant had NO INTENTION of modifying her mortgage, it was only to drag out the process to INCREASE Plaintiff's mortgage (pay-off), and DECREASE her Equity, and during the last 5-yrs, she has lived in fear of losing her home, and its taken its toll on her.

16. Defendant has caused, and continues to cause Plaintiff physical, emotional, and financial pain, suffering, injury, harm, and loss. And at this late stage in her life, **she may NEVER RECOVER** from it.

17. Defendant's practices, methods, and actions as described herein, offends public policy, is unfair, deceptive, unethical, oppressive, unreasonable and/or outrageous, and did in fact, cause Genevieve Henderson medical issues (blood pressure, physical pain, sleep problems), substantial injury, and violated her rights as they exist by statute, principals of law and equity, and constitutes the following

## LEGAL CLAIM

18. Paragraphs 1 through 17 are incorporated herein by reference.

19. A. **BREACH OF CONTRACT**:

    The facts of which are:

    About June of 2011, the Plaintiff and Defendant entered into a Contract that would modify the Plaintiff's mortgage. The Plaintiff agreed to make 3 consecutive temporary payments of $304 per month to Defendant, commencing July of 2011, and upon successful completion, Defendant would modify Plaintiff's mortgage. This Plaintiff did, in fact, complete said trial payment plan in September of 2011. And although the Defendant did accept and cash each of Plaintiff's check payments, Defendant BREACHED said contract by refusing to modify Plaintiff's mortgage, notwithstanding that **Defendant PARTLY PERFORMED SAID CONTRACT** by accepting, cashing, and keeping those payments and benefiting therefrom, WITHOUT fulfilling their AGREEMENT to modify Plaintiff's mortgage which is **a BREACH of CONTRACT**. 8 of 13

B. **UNFAIR TRADE PRACTICE:**

**Defendant committed Unfair Trade Practices** when Defendant/ Wells Fargo, agreed to modify Plaintiff's mortgage during mediation in the State Court (CV10-6003273), by way of a REVERSE MORTGAGE. However, Defendant induced Plaintiff to abandon Mediation and said Reverse Mortgage, with the promise of a speedy modification, claiming Plaintiff would not have to deal with mediation, delays, or attorneys any longer.   However, as soon as Mediation closed Plaintiff's file, Defendant reverted back to their same tactics of unreasonable requests which drug out the process for years, and consequently (by design), continued to **increase Plaintiff's mortgage and decrease her equity.**

**Defendant committed Unfair Trade Practices** when they knowingly turned a 2 or 3 month mortgage modification into over a 2 1/2 year mortgage application, during which time Defendant constantly and purposely changed contact persons about 15 times or more, and with each new contact person, Plaintiff had to start the process over again by submitting new documents which caused Plaintiff physical, emotional, and financial pain, suffering, injury, harm, and loss.   Each time they applied this delay tactic, it **caused Plaintiff's mortgage to increase and her equity to decrease.**

**Defendant committed Unfair Trade Practices** when Defendant applied their in-house formula (without Plaintiff's knowledge) to qualify Plaintiff for a mortgage modification, KNOWING under that formula, **Plaintiff could not possibly qualify.**   Moreover, at the same time,

Defendant knew of the formula that was available that could have been applied to qualify Plaintiff for said modification (see para.14).

Based on the above, Defendant caused Plaintiff physical, emotional, and financial pain, suffering, injury, harm, and loss, and deliberately **increased Plaintiff's mortgage** and **decreased her equity.**

**Defendant Committed Unfair Trade Practices** when Defendant commenced their foreclosure action **while Plaintiff's application** and approval process for her mortgage modification, **was still pending.**

**Defendant Committed Unfair Trade Practices** when Defendant when they commenced their Foreclosure Action in August of 2010 BEFORE they were assigned the Note and Mortgage, which WAS NOT ASSIGNED until October of 2011 (over 1 year after commencing their Action).

C. **MISREPRESENTATION OF FACTS**:

**Defendant misrepresented the facts** that are stated in above paragraph B (Unfair Trade Practices).  **Plaintiff did, in fact,** act upon **DEFENDANT'S FALSE STATEMENTS/ PROMISES** when Defendant PROMISED Plaintiff a speedy modification if she abandoned Mediation, and when Defendant BREACHED their contract with Plaintiff when she entered into a temporary payment plan **Agreement with the PROMISE of a modification, which did cause her harm/injury.**

D. **INFLICTION OF EMOTIONAL DISTRESS**:

The facts above entail the elements that support Plaintiff's claim **that Defendant's conduct was unreasonable and/or outrageous as well as;**            10 of 13

**a)** When at the outset(2010), while **Plaintiff WAS NOT IN FORECLOSURE** Defendant encouraged the Hamp instead of a Reverse Mortgage, (that Plaintiff asked for, and which was also agreed upon during Mediation) under the guise it was quicker;

**b)** When **Defendant REFUSED Plaintiff's mortgage payment** while she was still awaiting a modification decision;

**c)** When **Defendant FORECLOSED on Plaintiff** while she was still **AWAITING HER LOAN MODIFICATION** and **PRIOR** to the assignment of her Note and Mortgage.

**d)** When **Defendant INDUCED Plaintiff to ABANDON Mediation** with the **FALSE PROMISE** of a speedy modification, to avoid going forward with an AGREED Reverse Mortgage (when she was eligible).

**e)** When **Defendant BREACHED their contract Agreement** with Plaintiff, AFTER Defendant PARTLY PERFORMED said Contract;

**f)** when **Defendant IGNORED Plaintiff's requests for a Reverse Mortgage** and instead, placed her in programs they knew she **COULD NOT QUALIFY FOR** (without her knowledge) dragging out the process (which increased her mortgage and decreased her equity).

**g)** When **Defendant made Plaintiff literally produce HUNDREDS of documents**;

**h)** When **Defendant CONTINUALLY assigned new contact persons** knowing she had to start her paperwork all over again (which continually drug out the application process (for over 2 1/2 - 3 years);

**I)** W**hen Defendant mailed BACK-DATED letters**, as well as cluster letters to cover Plaintiff's Complaints of unreasonable, questionable practices;

**j)** When **Defendant caused Plaintiff to suffer (on a daily basis) for the last 5-yrs, with unreasonable requests and the fear of losing her home** (she lived in for 30-yrs.) not knowing what she will do at this late stage in her life.

E. **FRAUDULENT, UNLAWFUL and/or ABUSIVE** commencement of Foreclosure Action when Defendant commenced their Foreclosure in State Court (CV10-6003273) in August of 2010 **KNOWING** that **Defendant WAS NOT ASSIGNED the Note and/or Mortgage** at that time, and in fact, **those instruments WERE NOT ASSIGNED until October of 2011** (over 1 year AFTER they commenced their foreclosure Action).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays this Court enters Judgment granting Plaintiff:

19. A Declaration that the acts and omissions described herein violates Plaintiff's rights under State, Federal, and/or Common Law.

20. Compensatory Damages in amounts to make Plaintiff whole, including but not limited to

    A. Afford Plaintiff, or allow Plaintiff to solicit elsewhere, a REVERSE MORTGAGE based on her 2010 payoff of about $175,000.00 as Plaintiff requested at the outset, and several times PRIOR to Defendant's discontinuation of the Reverse Mortgage program.

    B. Afford Plaintiff the Home Affordable Mortgage Program (HAMP), based on her 2010 Mortgage Pay-off of about $175,000.00, reduced by 30%, at 2% interest, and 40-yr term, as Plaintiff believed and Defendant did not dispute (which should have been done at the outset).          12 of 13

- C. $300,000.00 for physical and/or emotional, and financial pain, suffering, injury, harm, and loss.

- D. $300,000.00 for Unfair Trade Practices.

- E. $500,000 for Breach of Contract.

- F. $500,00 for Fraudulent, Unlawful, and/or Abusive Commencement of Foreclosure Action.

21. Punitive Damages.

22. A Jury Trial on all issues triable by Jury.

23. Costs incurred by this suit.

24. Any additional relief this Honorable Court deems just and equitable.

Respectfully submitted,
PLAINTIFF

Genevieve Henderson
22 Lake Road
Middlefield, Ct. 06455

I, Genevieve Henderson, hereby certify under the penalties of perjury that I have read the foregoing amended Complaint and hereby verify that the matters alleged/ contained herein are true and accurate to the best of my knowledge and belief.
Executed at Middlefield, Connecticut, May 28 2015.

By Plaintiff _____

CERTIFICATION:
I hereby certify that a copy of the foregoing was mailed to Attorney Sean Higgins, of K&L Gates LLP, State Street Financial Center, One Lincoln Street, Boston, MA 02111, on May 28 ,2015

By G. Henderson _____

13 of 13