UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GENEVIEVE HENDERSON,<br>　*Plaintiff*,<br>*v.*<br>WELLS FARGO BANK, NA,<br>　*Defendant*. | Civil No. 3:13-cv-378 (JBA)<br><br>January 27, 2016 |

**RULING ON DEFENDANT'S MOTION TO DISMISS**

This suit, brought by pro se Plaintiff Genevieve Henderson against Defendant Wells Fargo Bank, NA ("Wells Fargo"), alleges breach of contract, unfair trade practices, misrepresentation, infliction of emotional distress, and fraudulent, unlawful and/or abusive commencement of foreclosure action, arising out of Wells Fargo's foreclosure on Plaintiff's house. (*See* Fourth Am. Compl. [Doc. # 48].) Wells Fargo now moves [Doc. # 59] to dismiss the complaint in its entirety. Oral argument was held on January 26, 2016. For the following reasons, Defendant's motion is granted in part and denied in part.

**I.　Factual Allegations**

**A.　HAMP Application**

Plaintiff alleges the following facts in her Fourth Amended Complaint. Plaintiff purchased her house in 1985. (Fourth Am. Compl. ¶ 4.) In 2008, she refinanced her mortgage, which was subsequently taken over by Wells Fargo. (*Id.*) Plaintiff dutifully made her mortgage payments as they became due, and by early 2010, her outstanding loans totaled $175,000. (*Id.*) In February 2010, Plaintiff, having suffered a decrease in her income, applied for a loan modification through the federal Home Affordable Mortgage Program ("HAMP"). (*Id.* ¶ 5.)

Plaintiff waited for a decision on her HAMP application for months. (*Id.* ¶ 6.) In the interim, she missed two payments on her mortgage. (*Id.*) When she attempted, at Wells Fargo's direction, to make a payment before another became due, Wells Fargo refused to accept the money. (*Id.* ¶¶ 6–7.) In August 2010, while Plaintiff was still waiting for a decision on her HAMP application, Wells Fargo commenced a foreclosure action against her in state court. (*Id.* ¶ 8.)

As part of the state court action, Ms. Henderson participated in mediation with Wells Fargo. (*Id.* ¶ 9.) During the mediation, all parties agreed that Wells Fargo would modify Plaintiff's mortgage with a reverse mortgage. (*Id*) "However, shortly after that agreement, Wells [Fargo] contacted Plaintiff and induced her to abandon Mediation with the promise that [it] had all the paperwork they needed to go forward with the HAMP and they would send the paperwork directly to underwriting with no further delays. . . ." (*Id.*) "Based on Defendant's representations, Plaintiff abandoned Mediation . . . ." (*Id.*)

### B. The Special Forbearance Agreement

In June 2011, with the foreclosure action still on hold, Plaintiff entered into a Special Forbearance Agreement ("the Agreement") with Wells Fargo.[1] (*Id.* ¶ 10.) Under

---

[1] Plaintiff did not attach a copy of this agreement to her Complaint. However, after Defendant submitted a copy of the agreement with its motion to dismiss (*see* Ex. A to Mem. Supp. Mot. to Dismiss [Doc. # 60]), Plaintiff filed a copy with her opposition to the motion to dismiss (*see* Ex. A to Opp'n Mot. to Dismiss [Doc. # 61]). Plaintiff's version and Defendant's version are identical with two notable exceptions. First, Section 5 of Plaintiff's version includes only three payments of $304.11 each, whereas Section 5 of Defendant's version additionally includes a fourth payment, of $47,556.82. Second, Defendant's version is signed by Plaintiff and includes a handwritten note, apparently written by her; Plaintiff's version is unsigned. Each side intimates that the other party's version has been somehow altered.

the Agreement, Wells Fargo "temporarily accept[ed] reduced installments" on Plaintiff's mortgage, in the amount of $304.11 per month for a period of three months. (Agreement, Ex. A to Opp'n Mot. to Dismiss at 3.) The Agreement warned, however, that "[u]pon successful completion of the Agreement, [Plaintiff's] loan [would still] not be contractually current. Since the installments may be less than the total amount due, [Plaintiff] may still have outstanding payments and fees." (*Id.*) It continued: "Any outstanding payments and fees will be reviewed for a loan modification, based on investor guidelines, [sic] this will satisfy the remaining past due payments on your loan and we will send you a loan modification agreement. An additional payment may be required." (*Id.*) Section 3 of the Agreement stipulated: "The lender is under no obligation to enter into any further agreement, and this Agreement shall not constitute a waiver of the lender's right to insist upon strict performance in the future." (*Id.*) Under Section 4:

> All of the provisions of the Note and Security Instrument, except as herein provided, shall remain in full force and effect. Any breach of any provision of this Agreement or non-compliance with this Agreement, shall render

---

As this is a motion to dismiss, the Court must take Plaintiff's factual allegations as true. Where, as here, there is a dispute of fact, the dispute is construed in the non-moving party's favor. For that reason, Defendant agreed at oral argument that for purposes of the motion to dismiss, the Court should consider only Plaintiff's version of the contract, leaving for later stages of litigation any disputes about which version of the contract Plaintiff in fact signed. While Plaintiff's version of the contract was not attached to the Complaint, "the [C]ourt may nevertheless take the document into consideration in deciding the defendant's motion to dismiss" because Plaintiff's Complaint "relies heavily upon [the contract's] terms and effect." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995) (internal quotation marks omitted); *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (internal quotation marks omitted)).

the forbearance null and void. The lender, in its sole discretion and without further notice to [Plaintiff], may terminate this Agreement. If the Agreement is terminated the lender may institute foreclosure proceedings according to the terms of the Note and Security Instrument. In the event of foreclosure, [Plaintiff] may incur additional expenses of attorney's fees and foreclosure costs.

(*Id.*)

A cover letter to the Agreement explained:

This is not a waiver of the accrued or future payments that become due, but a trial period showing you can make regular monthly payments. . . . Any outstanding payments and fees will be reviewed for a loan modification. If approved for a loan modification, based on investor guidelines, this will satisfy the remaining past due payments on your loan and we will send you a loan modification agreement. . . . Any installments received will be applied to the unpaid principal balance on the loan. . . . If your loan is in foreclosure, we will instruct our foreclosure counsel to suspend foreclosure proceedings once the initial installment has been received, and to continue to suspect the action as long as you keep to the terms of the Agreement. Upon full reinstatement, we will instruct [sic] our foreclosure proceedings and report to the credit bureaus accordingly.

(*Id.* at 1–2.)

Plaintiff timely paid all three trial period payments. (Fourth Am. Compl. ¶ 10.) However, Wells Fargo did not send her a loan modification agreement. (*Id.*) On June 6, 2012, Wells Fargo placed Plaintiff in "active foreclosure." (*Id.* ¶ 12.) On June 14, 2012, Defendant notified Plaintiff she did not qualify for a HAMP modification. (*Id.* ¶ 13.)

### C. Defendant's Conduct

In the time between February 2010, when Plaintiff first applied for a HAMP modification, and June 2012 when Defendant notified her that she did not qualify for a modification, "Defendant constantly and purposely changed contact persons about 15 times or more, and with each new contact person, Plaintiff had to start the process over

4

again by submitting new documents . . . . Each time [Defendant] applied this delay tactic, it caused Plaintiff's mortgage to increase and her equity to decrease." (*Id.* ¶ 19(B).) In the process of considering Plaintiff's HAMP application, Defendant requested that Plaintiff produce "boxes of documentation," amounting to "hundreds of documents." (*Id.* ¶ 12.)

As a result of Defendant's delays in processing Plaintiff's HAMP application and its failure to modify Plaintiff's payments, Plaintiff's outstanding debt increased by over $100,000. (*Id.* ¶ 14.) In addition, she suffered "a tremendous amount of stress, pain, and suffering," increased blood pressure, and difficulty sleeping. (*Id.* ¶¶ 15, 17.) Plaintiff alleges that Defendant never intended to modify her mortgage and only induced her to sign the Agreement in order to "drag out the process," "increase Plaintiff's mortgage," and "decrease her equity." (*Id.* ¶ 15.)

## II.  Discussion[2]

Defendant contends that Plaintiff's Complaint should be dismissed for failure to state a claim for which relief can be granted.

### A.  Right of Action under HAMP

As a preliminary matter, Defendant argues that "the Complaint is an indirect attempt to create a private enforcement mechanism under HAMP where Congress expressly refused to do so," and should therefore be dismissed for failure to state a claim.

---

[2] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Conclusory allegations are not sufficient. *Id.* at 678–79; *see also* Fed. R. Civ. P. 12(b)(6).

(Mem. Supp. Mot. to Dismiss [Doc. # 60] at 7–8.) "Numerous courts have rejected this argument and so does this Court." *Suttcliffe v. Wells Fargo Bank, NA*, 283 F.R.D. 533, 553 (N.D. Cal. 2012); *see, e.g., Wigod v. Wells Fargo Bank, NA*, 673 F.3d 547, 581–82 (7th Cir. 2012); *Picini v. Chase Home Finance LLC*, 854 F. Supp. 2d 266, 274 (E.D.N.Y. 2012); *Darcy v. CitiFinancial, Inc.*, 2011 WL 3758805, at *4 (W.D. Mich., Aug. 25, 2011); *Belyea v. Litton Loan Servicing, LLP*, 2011 WL 2884964, at *8 (D. Mass. July 15, 2011); *Bosque v. Wells Fargo Bank, NA*, 762 F. Supp. 2d 342, 250 (D. Mass. 2011).

"Whether HAMP creates a private right of action . . . is not the issue in this case. Plaintiff has brought suit on the theory that the [Agreement] constituted a contract between defendant and plaintiff, and that defendant breached that contract." *Stagikas v. Saxon Mortg. Servs. Inc.*, 795 F. Supp. 2d 129, 135 (D. Mass. 2011). "[W]ithout some explicit direction from Congress that it intended programs such as HAMP to have . . . preemptive force, the Court will not preclude [the plaintiff] from pursuing her basic state common law remedies." *Fletcher v. OneWest Bank, FSB*, 798 F. Supp. 2d 925, 931 (N.D. Ill. 2011). "To [hold] otherwise would require adopting the novel presumption that where Congress provides no remedy under federal law, state law may not afford one in its stead." *Wigod*, 673 F.3d at 581. This Court, like the majority of courts to consider this issue, declines to adopt such a presumption.

### B.  Breach of Contract

In order to state a claim for breach of contract in Connecticut, a plaintiff must allege: "(1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the opposing party; (4) direct and proximate cause; and (5) damages."

*McMann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 503–04 (2006).

Defendant asserts that Plaintiff's claim should be dismissed because she has not plausibly alleged that there was an enforceable contract under which Wells Fargo agreed to modify her loan. (Mem. Supp. at 8.) Specifically, Defendant contends: (1) contrary to Plaintiff's contentions, the parties did not enter into a trial payment plan contract (*id*. at 8–9); (2) "the parties never intended, nor did they agree, to enter into a contract under which Wells Fargo was required to provide Henderson with a loan modification" (*id*. at 11; Reply [Doc. # 63] at 4–6); and (3) Plaintiff "does not plead any facts establishing the exchange of consideration to support that purported agreement" (*id*. at 9).[3]

1. The Nature of the Contract

As to Defendant's first claim, it is apparent from both parties' versions of the contract that the Agreement was not a Trial Period Plan ("TPP") as that term is used by the government with respect to HAMP, and Plaintiff never received a TPP. Under the HAMP guidelines, a "borrower applying for modification initially provides the lender with required documentation. If the borrower is eligible, the lender reduces the monthly mortgage payment to thirty-one percent of the homeowner's gross monthly income. The homeowner participates in a three-month [TPP] based on the new mortgage payment."

---

[3] Defendant asserted argued at oral argument that the breach of contract claim should be dismissed for lack of damages because Ms. Henderson's only damages consist of money she already owed Wells Fargo. Aside from the fact that a party may not raise a new argument at oral argument, this argument fails because Ms. Henderson has alleged that the amount of her debt increased due to Wells Fargo's conduct (Fourth Am. Compl. ¶ 15) and because she has alleged damages in the form of "stress, pain, and suffering," increased blood pressure, and difficulty sleeping (*id*. ¶¶ 15, 17).

*Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 787 (S.D.N.Y. 2011). In order to participate in this trial period plan, borrowers must sign the TPP agreement, a four-page form created by the government for use by servicers and eligible borrowers. *Bosque*, 762 F. Supp. 2d at 348. The TPP form is somewhat similar but not identical[4] to the Special Forbearance Agreement at issue in this case.

Notwithstanding this distinction, the Special Forbearance Agreement, like the TPP,[5] could plausibly be read to require Wells Fargo to provide Plaintiff with a loan modification agreement. Under the Agreement, after Plaintiff made the three payments required under Section 5, "[a]ny outstanding payments and fees *will be reviewed for a loan modification*, based on investor guidelines, [sic] *this will satisfy the remaining past due payments* on your loan and *we will send you a loan modification agreement*." (Agreement at 3 (emphasis added).) Though hardly "unambiguous" (Wells Fargo's claims

---

[4] The TPP states in relevant part: "If I am in compliance with this Loan Trial Period . . . then the Lender will provide me with a Loan Modification Agreement . . . . I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed. . . ." *Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 881–82 (1st Cir. 2013).

[5] Whether the TPP is an enforceable contract for a loan modification has been the subject of extensive litigation both inside and outside this Circuit, with courts reaching mixed results. The Second Circuit has not weighed in on the issue, but the First, Ninth, and Seventh Circuits have held that the TPP is an enforceable contract. *See Corvello*, 728 F.3d at 885; *Young v. Wells Fargo Bank, NA*, 717 F.3d 224, 235 (9th Cir. 2013); *Wigod*, 673 F.3d at 566. Those courts reasoned that the most "natural and fair interpretation of the TPP is that the servicer must send a signed Modification Agreement offering to modify the loan once borrowers meet their end of the bargain. . . . [T]here could be no actual mortgage modification until all the requirements were met, but the servicer could not unilaterally and without justification refuse to send the offer." *Corvello*, 728 F.3d at 883.

to the contrary notwithstanding[6] (*see* Reply at 3, 4)), this language could plausibly be understood as a promise by Wells Fargo to send Plaintiff a loan modification agreement if she made the three payments.

---

[6] Defendant asserts, purportedly quoting the contract, that "[t]he terms of the Forbearance Agreement expressly provide: '**If approved** for a loan modification based on investor guidelines . . . we will send you a modification agreement.'" (Reply at 3.) However, this critical "if approved" language does *not* appear in the Forbearance Agreement, but rather only in the *cover letter* to the contract, which is not a part of the contract. The cover letter reads:

> [A]ny outstanding payments and fees will be reviewed for a loan modification. *If approved* for a loan modification, based on investor guidelines, this will satisfy the remaining past due payments on your loan and we will send you a loan modification agreement

(Agreement at 1 (emphasis added).) The contract reads:

> [A]ny outstanding payments and fees will be reviewed for a loan modification, based on investor guidelines, [sic] this will satisfy the remaining past due payments on your loan and we will send you a loan modification agreement

(Agreement at 3).

Defendant nonetheless contends that Plaintiff's interpretation is not plausible in light of Section 3, which states that "[t]he lender is under no obligation to enter into any further agreement." But, in light of the absent "if approved" language in the contract, the Court finds the "more natural and fair interpretation" to be that Wells Fargo agreed to "send a signed Modification Agreement offering to modify the loan once [Ms. Henderson met her] end of the bargain. . . . [T]here could be no actual mortgage modification until all the requirements were met, but the servicer could not unilaterally and without justification refuse to send the offer." *Corvello*, 728 F.3d at 883.

"In any event, the most . . . [D]efendant[']s arguments have done is inject a degree of ambiguity into the contract. They fall far short of showing that the only reasonable interpretation of the [contract] supports [Defendant's] position." *Young*, 717 F.3d at 235.

This is particularly so because (unlike in the TPP cases, in which the contract at issue is government-created) Wells Fargo itself drafted the contract, and "[w]hen the language in a contract is ambiguous, courts construe the ambiguity against the drafter." *DiNardo Seaside Tower, Ltd. v. Sikorsky Aircraft Corp.*, 153 Conn. App. 10, 34 (2014). As the Connecticut Supreme Court explained:

> The premise behind th[is] rule is simple. The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests. . . . A further, related rationale for the rule is that [s]ince one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are resolved in favor of the latter.

*David M. Somers & Associates, P.C. v. Busch*, 283 Conn. 396, 405 (2007).

Here, as in the TPP context,

> Wells Fargo's interpretation of the [contract it drafted] [is] suspect because it allow[s] banks to avoid their obligations to borrowers merely by choosing not to send a signed Modification Agreement, even though the borrower[] made . . . the required payments. As the Seventh Circuit put it, Wells Fargo's interpretation would allow it to "simply refuse to send the Modification Agreement for any reason whatsoever—interest rates went up, the economy soured, it just didn't like [the Borrower]—and there would still be no breach . . . turn[ing] an otherwise straightforward offer into an illusion. . . . [The interpretation of the contract urged by the plaintiff] avoids the injustice that would result were Wells Fargo's position accepted and Wells Fargo allowed to keep borrowers' trial payments without fulfilling any obligations in return.

*Corvello*, 728 F.3d at 883 (quoting *Wigod*, 673 F.3d at 566). For all of these reasons, the Court rejects Wells Fargo's contention that the Agreement cannot plausibly be read to require it to send Plaintiff a Modification Agreement.

### 2. Consideration

That brings the Court to Defendant's final argument with respect to the breach of contract claim: the Agreement is unenforceable because it lacks legal consideration. In Connecticut, "[a] modification of an agreement must be supported by valid consideration and requires a party to do, or promise to do, something further than, or different from, that which he is already bound to do." *Thoma v. Oxford Performance Materials, Inc.*, 153 Conn. App. 50, 56 (2014) (internal quotation marks omitted); *see also New England Rock Servs., Inc. v. Empire Paving, Inc.*, 53 Conn. App. 771, 776–77 (1999) ("It is an accepted principle of law in this state that when a party agrees to perform an obligation for another to whom that obligation is already owed, although for lesser remuneration, the second agreement does not constitute a valid, binding contract."). Here, Defendant argues that because Plaintiff was already legally bound to pay the money she agreed to pay in the Agreement, she did not promise to do "something further than, or different from, that which [s]he [wa]s already bound to do," and the Agreement thus lacks consideration. *Thoma*, 153 Conn. App. at 56.

The Court disagrees. As Judge Hibbler reasoned in *Fletcher*,

> [w]hen [the plaintiff] made her reduced trial period payments, she was not relieved of her ultimate obligation to pay back the debt she did not pay as a result of those reductions, nor was she relieved of the consequences of failing to pay her full monthly payments during those months. Thus, by agreeing to make reduced monthly payments during the trial period, [the plaintiff] was essentially agreeing only to delay her obligations on paying back the loan.

798 F. Supp. 2d at 932.

It is reasonable to infer that by delaying making her full monthly payments, Plaintiff committed herself to paying a greater amount in the long-run, as for the months she made reduced payments, interest accrued on a larger sum of principal than it otherwise would have. "Thus, it is unfair to categorize [the plaintiff's] promise to pay reduced monthly payments solely as a pre-existing duty. While [the plaintiff] did have a pre-existing duty to pay that amount to [Wells Fargo], she actually suffered some detriment by agreeing to pay less than the full amount she owed." *Id.* Therefore, Plaintiff's breach of contract claim will not be dismissed for failure to allege facts from which consideration could reasonably be inferred.

### C. Unfair Trade Practices

Defendant contends that Plaintiff's unfair trade practice claim should be dismissed because Plaintiff "does not plead sufficient facts to establish that Wells Fargo violated public policy, or engaged in deceptive, unethical, or unscrupulous conduct." (Mem. Supp. at 13.) Under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a), "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." To assist courts in determining whether a practice violates CUTPA, the Connecticut Supreme Court has identified several relevant factors:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise . . . ; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers.

*Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc.*, 296 Conn. 315, 350 (2010) (internal quotation marks omitted). "All three criteria do not need to be satisfied to support a

finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 350–51 (internal quotation marks omitted).

Here, Plaintiff alleges the following CUTPA violations: (1) Wells Fargo induced her to abandon mediation on the promise that it would modify her loan, knowing that she would not qualify for a modification, then intentionally delayed the modification process to increase her loan and decrease her equity, and finally, refused to modify the loan, despite having agreed to do so; (2) Defendant recommenced a foreclosure action while Plaintiff's application for a modification was still pending; and (3) Defendant commenced a foreclosure action before it was assigned the note and mortgage. (Fourth Am. Compl. ¶ 19B.)

Defendant's contention that these CUTPA claims should be dismissed appears to be threefold. First, Defendant asserts that Plaintiff's allegations are insufficient because Ms. Henderson does not "plead any facts describing how [Wells Fargo's] acts violate the statute, how these actions offend public policy, how these actions were immoral, unethical, oppressive, or unscrupulous, or how these actions cause substantial injury." (Mem. Supp. at 13–14.) Second, Defendant argues that Plaintiff's claims are "based on the incorrect premise that Wells Fargo is required to provide her with a loan modification under HAMP." (*Id.* at 14.) Finally, Defendant maintains that Plaintiff's third CUTPA claim has already been adjudicated in state court proceedings, and Plaintiff is precluded from relitigating it here. (*See id.* at 15 n.9.)

Only Defendant's third argument has merit. Defendant's first argument relies on an inaccurate characterization of Plaintiff's Complaint. The Complaint is not filled with

13

conclusory allegations as Defendant claims. It contains adequate factual content to permit a factfinder to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Federal Rules of Civil Procedure require no more.

Although a CUTPA claim cannot arise out of a simple breach of contract absent some "significant aggravating circumstances," "the Connecticut Supreme Court has held that a party's refusal to perform under a valid contract while retaining the benefits of that contract constitutes [a] . . . significant aggravating circumstance[]." *Canaan Apothecary, LLC v. Salisbury Pharmacy Grp., LLC*, No. 3:12-CV-1571 (VLB), 2014 WL 788944, at *8 (D. Conn. Feb. 25, 2014) (internal quotation marks omitted) (citing *Saturn Constr. Co. v. Premier Roofing Co.*, 238 Conn. 293, 680 (1996)); *see BAC Home Loans Servicing, L.P. v. Presutti*, No. HHDCV095029746S, 2010 WL 1883681, at *1 (Conn. Super. Ct. Apr. 8, 2010) ("[T]he allegations that the Plaintiff entered into a loan mortgage modification which it refused to honor, are sufficient to support a CUTPA claim."). Plaintiff here has alleged just that, and more. According to Plaintiff's Complaint, not only did Wells Fargo induce her to make trial payments and then refuse to hold up its end of the bargain, it entered into the Agreement with Plaintiff knowing from the beginning that it was not going to offer her a modification. Moreover, it intentionally dragged out its processing of the modification agreement in order to increase Plaintiff's debt, to its benefit. Finally, after inducing her to abandon mediation, enter into the Agreement, and make three trial payments, it recommended foreclosure proceedings before it even notified her that it was not going to modify her loan and then refused to refund the trial payments Plaintiff had made. These allegations suffice to state a claim for unfair trade practices under CUTPA.

Defendant's next argument, that Plaintiff's claims are "based on the incorrect premise that Wells Fargo is required to provide her with a loan modification under HAMP" (Mem. Supp. at 14), fails for the same reasons its position regarding the implausibility of Plaintiff's breach of contract claim fails; Plaintiff has alleged a factual basis alleged for her claim that Wells Fargo was obligated to offer her a loan modification agreement.

Defendant's final argument (raised in a footnote), however, that Plaintiff is precluded from alleging that Wells Fargo did not possess the Note when it foreclosed because that issue was raised and rejected in the state court proceedings, has merit. "To determine the effect of a state court judgment, federal courts, including those sitting in diversity, are required to apply the preclusion law of the rendering state." *Id*. at 87.

In Connecticut,

> [f]or an issue to be subject to collateral estoppel,[7] it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment. . . . An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. . . . An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered. . . . If an issue has been determined, but the judgment is not dependent [on] the determination of the issue, the parties may relitigate the issue in a subsequent action. Findings on nonessential issues usually have the characteristics of dicta.

*Lighthouse Landings, Inc. v. Conn. Light & Power Co.*, 300 Conn. 325, 343–44 (2011) (internal quotation marks omitted).

---

[7] Defendant clarified at oral argument that it is claiming collateral estoppel (issue preclusion).

Plaintiff here appears to have raised all of the issues described in her Complaint in the prior state court foreclosure action[8] (*see* Mem. of Decision Mot. for Summ. J., Ex. B to Defendant's Mem. Supp. at 5), although most of those claims were not actually litigated. The state court struck Ms. Henderson's special defenses of refusal to accept payment, breach of contract, and misrepresentation of facts because "none of the special defenses related to the making, validity and enforcement of the note, and therefore, did not constitute valid defenses to the foreclosure action." (*Id.*) These claims were therefore neither "in fact determined," nor "necessarily determined." The state court did, however, consider and reject Ms. Henderson's allegation that "Wells Fargo was not assigned the Mortgage and Note on or before August 2010 when it filed the [foreclosure] complaint." (*Id.*) The court found that Ms. Henderson had "presented no evidence to support her argument that [Wells Fargo] was not the holder of the Note and assignee of the Mortgage on the date th[e] [foreclosure] action occurred." (*Id.*) As such, this issue was "in fact determined," and because the judgment could not have been reached without addressing this issue, it was also "necessarily determined," notwithstanding the pendency of Plaintiff's appeal. Defendant's motion to dismiss is therefore granted as to Plaintiff's allegations concerning whether Wells Fargo possessed the Note when it commenced foreclosure proceedings, but denied as to the remainder of Plaintiff's CUTPA claims.

---

[8] "On a motion to dismiss under Rule 12(b)(6), judicial notice may be taken of other judicial documents that might provide the basis for issue preclusion." *Can v. Goodrich Pump & Engine Ctrl. Sys., Inc.*, 711 F. Supp. 2d 241, 246 (D. Conn. 2010).

### D. Misrepresentation of Facts (Negligent Misrepresenation)[9]

Defendant next argues that Ms. Henderson failed to plead the essential elements of a claim for negligent misrepresentation. (*See* Mem. Supp. at 11–13.)

Under Connecticut law, "[o]ne who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 143 (2010) (internal quotation marks omitted). "[E]ven an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth." *Id.* (internal quotation marks omitted).

Ms. Henderson's claim of negligent misrepresentation appears to be as follows: a representative of Wells Fargo contacted her in early 2011 and told her that Wells Fargo "had all the paperwork [it] needed to go forward with the HAMP [modification] and they would send the paperwork directly to underwriting with no further delays" (Fourth Am. Compl. ¶ 9); "[b]ased on Defendant's representations, Plaintiff abandoned Mediation in expectation of a speedy resolution/approval from underwriting" (*id.* ¶ 10); "[i]nstead, when Mediation closed Plaintiff's file, the delays and endless requests for paper-work [sic] started over again (and never ended)" (*id*); after the parties signed the Agreement, Plaintiff made the three payments she was obligated to make under the agreement and Defendant refused to honor its end of the bargain by modifying Plaintiff's loan (*id*);

---

[9] Ms. Henderson stated at oral argument that she is claiming negligent misrepresentation and not fraudulent misrepresentation.

Defendant then informed Plaintiff that she did not qualify for a modification using a formula under which it knew Plaintiff could not have qualified (*id.* ¶ 19(B)); by then, Wells Fargo had already recommenced the foreclosure action (*id.* ¶ 12).

In short, Ms. Henderson claims that Defendant represented it would modify her loan, induced her to rely on that promise, knowing it was a false promise, and as a result of her reliance, she was injured. These allegations are sufficient to state a plausible claim for negligent misrepresentation.

### E. Negligent Infliction of Emotional Distress[10]

The fourth count in Plaintiff's Complaint alleges negligent infliction of emotional distress. In Connecticut, there are four elements to a negligent infliction of emotional distress ("NIED") claim: (1) "the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress[;] [2] the plaintiff's distress was foreseeable[;] [3] the emotional distress was severe enough that it might result in illness or bodily harm[;] and[] . . . [4] the defendant's conduct was the cause of the plaintiff's distress." *Olson v. Bristol-Burlington Health Dist.*, 87 Conn. App. 1, 5 (2005) (citing *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 446 (2003)). "[A] pivotal difference between claims for emotional distress based on intentional conduct and those based on negligent conduct" is that an NIED claim, unlike a claim for intentional infliction of emotional distress, need not be based on extreme and outrageous behavior by the defendant. *Id.* at 7.

Plaintiff here has plausibly stated a claim for NIED. Defendant's alleged conduct in inducing Plaintiff to end the mediation process on the promise that she would be able

---

[10] Ms. Henderson clarified at oral argument that she is claiming negligent infliction of emotional distress and not intentional infliction of emotional distress.

to modify her loan; stringing her along for a year, all the while knowing that it was not going to modify her loan; requesting that she send Wells Fargo hundreds of documents; forcing her to repeatedly begin the process anew with numerous different representatives; accepting her trial period payments and then refusing to honor its agreement to modify her loan; and finally, recommencing foreclosure proceedings without even notifying Plaintiff that she had not qualified for a modification, is sufficient to state a colorable claim of NIED. For this reason, Defendant's motion to dismiss is denied as to Plaintiff's NIED claim.

### A.  Fraudulent, Unlawful, and Abusive Commencement of Foreclosure Action

Plaintiff's final claim is for fraudulent, unlawful, and abusive commencement of a foreclosure action. (*See* Fourth Am. Compl. ¶ 19E.) Defendant contends that this claim should be dismissed because no such cause of action exists in Connecticut. Plaintiff has cited no cases recognizing the tort of abusive foreclosure in Connecticut, and the Court has found none. Therefore, this claim is dismissed.

### III.  Conclusion

For the foregoing reasons, Defendant's Motion [Doc. # 59] to Dismiss is GRANTED as to Plaintiff's claim that Wells Fargo did not hold the Note when it initiated foreclosure proceedings and Plaintiff's abusive foreclosure claim, and otherwise DENIED.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 27th day of January, 2016.