UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GENEVIEVE HENDERSON,<br><br>Plaintiff,<br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | ) | Civil Action No. 3:13-cv-00378-JBA |

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

Plaintiff Genevieve Henderson ("Plaintiff") asserts claims for breach of contract, negligent misrepresentation, violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), and negligent infliction of emotional distress ("NIED") against Defendant Wells Fargo Bank, N.A. ("Wells Fargo") arising from Wells Fargo's mortgage loan servicing conduct and its subsequent foreclosure of her property. The primary focus of Plaintiff's lawsuit is a claim that Wells Fargo failed to honor a 2011 Special Forbearance Agreement, which she alleges obligated Wells Fargo to modify her mortgage loan. The undisputed material facts establish that Plaintiff's claim fails, however, because any alleged agreement upon which Plaintiff attempts to rely is inadmissible under Federal Rule Of Evidence 408 because it was the product of settlement negotiations between the parties in a concurrently pending state court foreclosure litigation. In any event, the undisputed material facts establish that the allegations that Plaintiff made in her Complaint are all indisputably incorrect, thus dooming her case to fail as a matter of law because she cannot establish the prima facie elements of any of her legal claims. For

these reasons, and as set forth in detail below, this Court should enter summary judgment in Wells Fargo's favor dismissing Plaintiff's Complaint.

# I. FACTS

## A. Loan Origination.

On or about December 31, 2007, Plaintiff refinanced an existing mortgage loan on her home located at 22 Lake Road, Middlefield, Connecticut (the "Property") by executing a promissory note (the "Note") to Wachovia Mortgage Corporation ("Wachovia") in the principal amount of $180,000. SOF ¶ 1. To secure repayment of the Note, Plaintiff granted Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee for Wachovia and Wachovia's successors and assigns, a mortgage (the "Mortgage," together with the Note, the "Mortgage Loan" or "Loan") on the Property. SOF ¶ 2. On September 29, 2009, Wells Fargo notified Plaintiff that it had acquired Wachovia and that, beginning October 16, 2009, Wells Fargo would service the Loan. SOF ¶ 3. In early 2010, Plaintiff contacted Wells Fargo to inquire about a reverse mortgage or a loan modification because she could no longer afford her monthly payments. SOF ¶ 6. Wells Fargo did not contact or solicit Plaintiff to inquire about or apply for a HAMP loan modification. SOF ¶ 7. In April 2010, Wells Fargo provided Plaintiff with a payoff statement, so that she could explore refinance options with other lenders. SOF ¶¶ 9-10. She informed Wells Fargo, however, that she could not obtain any refinancing because her debt to income ratio was too high. SOF ¶ 10. Plaintiff has never submitted an application to Wells Fargo for a reverse mortgage. SOF ¶ 11.

## B. Default and Acceleration.

Plaintiff defaulted on the Mortgage Loan in March 2010 after failing to make the required monthly payment. SOF ¶ 12. Plaintiff also failed to make the required

payment in April 2010. SOF ¶ 13. Plaintiff has not made a full monthly payment on the Mortgage Loan, or cured the default, since the payment due for March 2010. SOF ¶ 14. At no time did Wells Fargo instruct Plaintiff to cease making payments. SOF ¶ 15. As a result of the default, Wells Fargo sent Plaintiff an acceleration notification dated April 18, 2010 that informed her that the Loan was in default for failure to make the required payments and that, unless she paid the total amount due, $3,579.66, Wells Fargo would accelerate the Loan. SOF ¶ 16. In response, Plaintiff attempted to make the payment only for May 2010, not the entire payment due after acceleration. SOF ¶ 17. Plaintiff never made the full payment due. SOF ¶ 19.

C. Pre-Foreclosure Loss Mitigation Efforts.

After Plaintiff missed payments, in March 2010, Wells Fargo informed her that it could review her for a HAMP loan modification. SOF ¶ 20. It did not, however, guarantee or promise Plaintiff she would be eligible for, qualify for, or receive a loan modification. SOF ¶ 21. In May 2010, Wells Fargo began to review Plaintiff for a HAMP loan modification. SOF ¶ 22. On July 21, 2010, Wells Fargo sent Plaintiff a letter requesting additional documents, including a copy of her 2008 tax returns, an extension of her 2009 tax returns and a copy of her social security and pension award letters, so that it could complete the HAMP review. SOF ¶ 23. When Wells Fargo did not receive the documents, it called Plaintiff on July 30, 2010 to follow up on its request. SOF ¶ 24. During the call, Plaintiff informed Wells Fargo that she could not provide the documents because she had not filed her taxes. SOF ¶ 25. Wells Fargo advised Plaintiff that to qualify for a HAMP loan modification, she was required to have filed her taxes. SOF ¶ 26. As a result, on August 4, 2010, Wells Fargo sent Plaintiff a letter notifying her that

she did not qualify for a HAMP loan modification because she did not provide the documents necessary to complete the review. SOF ¶¶ 27-28.

D. The Foreclosure Action.

Connecticut is a judicial foreclosure state. To enforce a mortgage and foreclose, a party must file a lawsuit. As a result, on August 6, 2010, two days *after* the HAMP denial, Wells Fargo initiated a foreclosure action against Plaintiff in state court [Docket No. MMX-CV10-6003273-S] (the "Foreclosure Action"). SOF ¶ 29. The Foreclosure Action, which pre-dates the current action by nearly three-years, remains pending and active. SOF ¶ 30. On March 11, 2013, to push the Foreclosure Action to judgment, Wells Fargo filed a motion for judgment of strict foreclosure. SOF ¶ 84. As a result of this motion, Plaintiff commenced the current action on March 19, 2013.[1] SOF ¶ 85. On August 31, 2015, the state court entered judgment of strict foreclosure in Wells Fargo's favor, which entitles Wells Fargo to possession of the Property.[2] SOF ¶¶ 90. Plaintiff subsequently appealed this decision to the Connecticut Appellate Court where it is currently pending. SOF ¶ 91.

E. State Court Mediation.

As part of the Foreclosure Action, Wells Fargo participated in the Connecticut state court foreclosure mediation program (the "State Court Mediation") with Plaintiff for the sole purpose of attempting to resolve the Foreclosure Action before it went to

---

[1] Importantly, a day prior to the commencement of the current action, Plaintiff filed special defenses in the Foreclosure Action alleging nearly identical claims in her special defenses as set forth in the federal court complaint. SOF ¶ 86. She also amended her special defenses on March 31, 2014, but they remained nearly identical to the claims asserted in the current action. SOF ¶ 87.

[2] During the time in which Wells Fargo filed its motion for judgment of strict foreclosure on March 11, 2013 and the entry of judgment of strict foreclosure on August 31, 2015, Plaintiff engaged in extensive motion practice by filing over 30 motions as well as an interlocutory appeal after the court granted Wells Fargo's motion for summary judgment that was subsequently denied. See Counsel's Aff. Ex. B-9, *Foreclosure Action Docket*.

judgment. SOF ¶ 31. Plaintiff and Wells Fargo attended and participated in several mediation sessions between September 2010 and May 2011, during which they actively negotiated potential settlement options including, but not limited to, considering Plaintiff for a HAMP loan modification or other non-HAMP options. SOF ¶ 32. The formal State Court Mediation ended on or about May 10, 2011 because, according to the mediator's final report, Plaintiff "has not submitted a complete financial package to [Wells Fargo] thru the mediation process. [Plaintiff] has been given extensive instructions and directions to complete the financial package. Mediator has made additional time outside of mediation to assist [Plaintiff] with completing the financial package." SOF ¶ 36. Although the review was not completed during mediation, Wells Fargo informed Plaintiff by a letter dated May 16, 2011 that she did not qualify for a HAMP loan modification because it was unable to create an affordable payment under HAMP. SOF ¶¶ 37-38.

F. Forbearance Agreement.

As a result of the settlement negotiations, Wells Fargo offered Plaintiff a temporary Special Forbearance Agreement on June 16, 2011 (the "Forbearance Agreement") in an attempt to resolve the Foreclosure Action. SOF ¶ 39. The Forbearance Agreement was sent to Plaintiff in a three-page packet, which included a cover letter with instructions. SOF ¶ 40. The Forbearance Agreement required Plaintiff to make four monthly payments — three payments of $304.11 and a fourth payment of $47,556.82. SOF ¶ 41. Subject to Plaintiff's performance under the Agreement, Wells Fargo agreed to review "[a]ny outstanding payments and fees … for a loan modification." SOF ¶ 42. The Agreement explicitly stated that Wells Fargo was "under no obligation to enter into any further agreement." SOF ¶ 43. The cover letter further

explained that "[u]pon successful completion of the Plan, … [a]ny outstanding payments and fees will be reviewed for a loan modification. If approved for a loan modification, based on investor guidelines, this will satisfy the remaining past due payments on your loan and we will send you a loan modification agreement." SOF ¶ 44. Plaintiff signed and returned the Forbearance Agreement to Wells Fargo on June 27, 2011. SOF ¶ 46. Plaintiff included handwritten notes on pages 1 and 3 of the Agreement that noted it was "sent certified mail return receipt" and that Plaintiff "enclosed [her] 1st installment of $304.11 (ck # 1093) due July 15, 2011 as set forth on Page 1, Paragraph 2 of this Agreement." SOF ¶ 47.

G. Plaintiff's Breach of the Forbearance Agreement.

Plaintiff made the first three payments of $304.11 for July, August, and September 2011 as required under the Forbearance Agreement. SOF ¶ 48. Plaintiff failed to make the fourth required payment of $47,556.82 in October 2011. SOF ¶ 49.

H. Further Loss Mitigation Efforts.

Despite Plaintiff's failed performance under the Forbearance Agreement, Wells Fargo reviewed Plaintiff for a HAMP loan modification beginning in October 2011. SOF ¶ 51. During the HAMP loan modification review process, Wells Fargo sent Plaintiff five letters requesting additional documentation between October 2011 and March 2012 to allow a complete review. SOF ¶ 52. These letters requested documents from Plaintiff and an alleged tenant seeking to verify and confirm Plaintiff's income and the alleged rent. SOF ¶¶ 53, 56-59. At some point thereafter, Plaintiff claims to have stopped reading the letters requesting additional documents. SOF ¶ 60. Nonetheless, on March 22, 2012, Plaintiff informed Wells Fargo that her tenant refused to provide Wells Fargo

documentation. SOF ¶ 61. As a result, by a letter dated March 28, 2012, more than five months after the HAMP review began, Wells Fargo informed Plaintiff that she did not qualify for the modification because she did not provide Wells Fargo with the documents necessary to complete the review and Wells Fargo was not able to reach Plaintiff to discuss the review. SOF ¶ 62.

After the March 2012 HAMP denial, Wells Fargo reviewed Plaintiff for a HAMP loan modification and Non-HAMP workout option on at least two additional occasions. SOF ¶ 63. The HAMP modification was denied by a letter dated June 12, 2012 because Wells Fargo was unable to create an affordable payment under HAMP. SOF ¶ 64. The Non-HAMP review was denied on July 30, 2012 because the investor declined to modify the Loan. SOF ¶ 65. Thus, in total, since March 2010, Wells Fargo reviewed Plaintiff for a HAMP loan modification on at least four separate occasions, and a Non-HAMP review on at least three occasions. SOF ¶ 66.

I. The Current Lawsuit.

Plaintiff filed this suit on March 19, 2013. SOF ¶ 85. On May 28, 2015, Plaintiff filed her final amended Complaint (the "Complaint"). SOF ¶ 89. On July 13, 2015, Wells Fargo filed a motion to dismiss the Complaint. See Federal Court Docket, DN 59-60. The Court held a hearing on the motion on January 26, 2016. Id. at 66. The Court permitted Plaintiff to proceed with her claims for breach of contract, negligent misrepresentation of fact, violations of the CUTPA, and NIED. Id. at 64-54; see also January 27, 2016 Motion to Dismiss Order, DN 64 (the "MTD Order"). Discovery has closed; Wells Fargo now seeks summary judgment.

## II. ARGUMENTS AND AUTHORITIES

### A. Summary Judgment Standard.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proof on a motion for summary judgment, and, to meet its burden, "must provide that no material factual issues exist." Claude v. Wells Fargo Bank, N.A., 2015 WL 5797007, at *6 (D. Conn. Sept. 30, 2015) (citing Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323–25 (1986). A dispute of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Baldwin v. EMI Feist Catalog, Inc., 805 F.3d 18, 25 (2d Cir.2015) (quoting Liberty Lobby, Inc., 477 U.S. at 248). "A party opposing summary judgment cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." Claude, 2015 WL 5797007, at *7 (citations omitted); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden … its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). Rather, at summary judgment, facts must be supported by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); see Claude, 2015 WL 5797007, at *7 ("At the summary judgment stage of the proceedings, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up are not

sufficient."). Simply put, a party opposing summary judgment "must present specific evidence demonstrating a genuine dispute." Marzullo v. Onofrio, 2016 WL 4250224, at *2–3 (D. Conn. Aug. 10, 2016) (citing Gannon v. UPS, 529 Fed.Appx. 102, 103 (2d Cir. 2013)). Here, Plaintiff cannot defeat summary judgment because she cannot adduce any evidence demonstrating any genuine issues of material fact.

B. The Forbearance Agreement And Any Representations Made During Settlement Negotiations Are Inadmissible Under Federal Rule Of Evidence 408.

Plaintiff's breach of contract claim, as well as portions of her negligent misrepresentation, CUTPA, and NIED claims, rely exclusively upon conduct intended solely to resolve the Foreclosure Action and prevent it from going to judgment. To establish her claims, Plaintiff relies upon the Forbearance Agreement, which was the result of settlement negotiations, and argues that Wells Fargo breached that agreement. The Forbearance Agreement, however, was never intended to change the relationship of the parties, which is governed exclusively by the Mortgage Loan. Rather, it was intended solely for the purpose of resolving the Foreclosure Action and forbearing Wells Fargo's efforts to foreclose. Because the Forbearance Agreement is the result of settlement negotiations, it is not admissible under Federal Rule of Evidence 408 ("FRE 408") to prove Plaintiff's breach of contract claim. Similarly, to establish her negligence and CUTPA claims, Plaintiff relies extensively on communications and representations made during the course of active settlement communications. Because such communications and representations were made with the purview of resolving the Foreclosure Action short of judgment, such communications and representations are inadmissible at summary judgment. Accordingly, to the extent that Plaintiff's claims rely on inadmissible evidence, each claim must fail.

1. *The Forbearance Agreement Is Inadmissible Under Rule 408.*

The Forbearance Agreement, which was the result of the settlement negotiations between the parties sin the State Court Mediation, is inadmissible under FRE 408 because Plaintiff offers it as evidence to "prove liability." FRE 408 prohibits evidence of settlement negotiations "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement." Fed. R. Evid. 408.[3] FRE 408 provides a narrow exception, inapplicable here, allowing the court to admit the evidence for "another purpose" such as proving bias, undue delay or criminal obstruction. Id. "The purpose of the rule is to encourage full and frank disclosure between the parties in order to promote settlements rather than protracted litigation." Olin Corp. v. Ins. Co. of N. Am., 603 F. Supp. 445, 449 (S.D.N.Y. 1985); see also Harty v. Bull's Head Realty, 2015 WL 1064630, at *5 (D. Conn. Mar. 11, 2015) ("The Rule bars the admission of most evidence of offers of compromise and settlement in furtherance of "the public policy favoring the compromise and settlement of disputes."). To determine if evidence should be excluded under Rule 408, a court "must weigh the need for evidence against the potentiality of discouraging future settlement negotiations." Arista Records LLC v. Lime Grp. LLC, 784 F.Supp. 2d

[3] Rule 408 states provides:

(a) Prohibited Uses. Evidence of the following is not admissible — on behalf of any party — either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
   (1) furnishing, promising, or offering — or accepting, promising to accept, or offering to accept — a valuable consideration in compromising or attempting to compromise the claim; and
   (2) conduct or a statement made during compromise negotiations about the claim — except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

(b) Exceptions. The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

398, 418 (S.D.N.Y. 2010); see Alpex Computer Corp. v. Nintendo Co., 770 F.Supp. 161, 163 (S.D.N.Y. 1991) ("All that is needed for Rule 408 to apply is an actual dispute, or at least an apparent difference of opinion between the parties as to the validity of a claim."). The Second Circuit has repeatedly applied FRE 408 to evidence submitted at summary judgment, not just trial. See Schaghticoke Tribal Nation v. Kempthorne, 587 F. Supp. 2d 389, 395 (D. Conn. 2008), *aff'd*, 587 F.3d 132 (2d Cir. 2009) (citation omitted) ("The principles governing admissibility of evidence do not change on a motion for summary judgment. ... Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").[4]

The Forbearance Agreement is inadmissible under FRE 408 because it was the result of settlement negotiations. In September 2010, after Wells Fargo filed the Foreclosure Action, Plaintiff and Wells Fargo attended and participated in several mediation sessions through May 2010 in an attempt to resolve the dispute. SOF ¶¶ 31-32. During these mediation sessions, Plaintiff and Wells Fargo actively negotiated potential settlement options, including, but not limited to, considering Plaintiff for a HAMP or non-HAMP loan modification. Id. The State Court Mediation formally ended in May 2010 after Plaintiff failed to submit a complete financial package to Wells Fargo to complete the review.[5] SOF ¶ 36. Nonetheless, in a continued effort to resolve the

---

[4] See also Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 510 (2d Cir.1989) (finding breach of contract claim unenforceable because documents were settlement offers, and thus, inadmissible); Ortiz v. Town of Stratford, 2008 WL 4630527, at *19 (D. Conn. Oct. 14, 2008) (ruling an offer of settlement is inadmissible under Rule 408 at summary judgment); Iron Workers Dist. Council of W. N.Y & Vicinity Annuity & Pension Funds v. D.C. Scott Inc., 474 F. Supp. 2d. 467, 473 (W.D.N.Y. 2007) (affirming summary judgment for plaintiff because previous settlement discussions were inadmissible).

[5] Plaintiff asserts that Wells Fargo induced her to abandon mediation with the promise of a loan modification. Plaintiff has no evidence that any such induction occurred. SOF ¶ 35. Further, the Foreclosure Mediator's Final Report establishes that the mediation ended because *Plaintiff* failed to provide the necessary documents for Wells Fargo to complete the modification review. SOF ¶ 36.

Foreclosure Action by settlement, Wells Fargo completed a review of Plaintiff's Loan for a HAMP loan modification and a Non-HAMP workout option after mediation ended. SOF ¶¶ 37-38. Plaintiff did not qualify for a HAMP loan modification because Wells Fargo was unable to create an affordable payment within the HAMP guidelines and informed Plaintiff of the denial by a letter dated May 16, 2011. Id. However, based upon the information obtained from Plaintiff in the State Court Mediation, Wells Fargo offered Plaintiff the Forbearance Agreement. SOF ¶ 39. The Forbearance Agreement is the sole basis of Plaintiff's breach of contract claim against Wells Fargo and is the sole evidence available for Plaintiff to attempt to "prove liability." Because the Forbearance Agreement is the result of settlement negotiations between Plaintiff and Wells Fargo and Plaintiff intends to offer the Forbearance Agreement to "prove liability" for her breach of contract claim, the Forbearance Agreement is inadmissible under FRE 408. Thus, because the Forbearance Agreement is inadmissible under FRE 408, Plaintiff's breach of contract claim must fail.

In her negligent misrepresentation, CUTPA, and NIED claims, Plaintiff relies, in part, upon the Forbearance Agreement to establish liability. See Complaint, DN 48, ¶¶ 10, 12, 19B; MTD Order, DN 64, pp. 14-15 17, 19. However, as articulated more fully above, the Forbearance Agreement is inadmissible under FRE 408 because it is the result of settlement negotiations between Plaintiff and Wells Fargo in an attempt to resolve the Foreclosure Action. Thus, to the extent Plaintiff's negligent misrepresentation, CUTPA, and NIED claims rely on the Forbearance Agreement to establish liability thereunder, those claims must fail because Plaintiff cannot adduce any admissible evidence to prove such claims.

2. *Representations Made During Settlement Negotiations Are Inadmissible To Establish Negligent Misrepresentation, CUTPA, and NIED.*

Any representations and communications between Plaintiff and Wells Fargo during the State Court Mediation, or the result of ongoing settlement communications, are similarly inadmissible under FRE 408 to establish "liability for" claims of negligent misrepresentation, violations of CUTPA, and NIED. In Plaintiff's Complaint, which the Court accepted as true for purposes of the motion to dismiss, Plaintiff alleged:

Negligent Misrepresentation

- "A representative of Wells Fargo contacted [Plaintiff] in early 2011 and told her that Wells Fargo 'had all the paperwork [it] needed to go forward with the HAMP [modification] and they would send the paperwork directly to underwriting with no further delays.'" See Complaint, DN 48, ¶ 9; MTD Order, DN 64, p. 17.
- "Based on [Wells Fargo's] representations, Plaintiff abandoned Mediation in expectation of a speedy resolution/approval from underwriting" See Complaint, DN 48, ¶ 10; MTD Order, DN 64, p. 17-18.

CUTPA

- "[A]fter inducing [Plaintiff] to abandon mediation, enter into the Agreement, and make three trial payments, [Wells Fargo] recommenced foreclosure proceedings before it even notified her that it was not going to modify her loan and then refused to refund the trial payments Plaintiff had made." See Complaint, DN 48, ¶ 19B; MTD Order, DN 64, p. 14.

NIED

- Wells Fargo's "alleged conduct in inducing Plaintiff to end the mediation process on the promise that she would be able to modify her loan." See Complaint, DN 48, ¶ 8; MTD Order, DN 64, p. 18-19.

In early 2011, Plaintiff and Wells Fargo were engaged in active and ongoing settlement communications to attempt to resolve the Foreclosure Action. SOF ¶¶ 31-32, 37. These negotiations included considering Plaintiff for a HAMP loan modification and other non-HAMP options. SOF ¶¶ 32, 37. Thus, any alleged representations from Wells Fargo to Plaintiff during settlement negotiations are inadmissible under FRE 408

because they would be offered to "prove liability for" Plaintiff's negligent misrepresentation, CUTPA, and NIED claims.

C. Plaintiff Cannot Recover For Breach Of The Forbearance Agreement Because She Breached The Agreement First.

Even if the Forbearance Agreement is not inadmissible under FRE 408, Plaintiff's breach of contract claim nevertheless fails because Plaintiff materially breached the Agreement by failing to make the fourth required payment. To establish a breach of contract, Plaintiff must prove: (1) the existence of an agreement; (2) that Plaintiff performed her obligations under the agreement; (3) that Wells Fargo breached the agreement; and (4) that Plaintiff was damaged as a result of Wells Fargo's breach. See McMann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc., 93 Conn. App. 486, 503–04 (2006). In general, a party cannot "recover damages under an agreement unless [she] has fully performed [her] own obligations under it." David M. Somers & Associates, P.C., v. Busch, 283 Conn. 396, 406 (2007); see Automobile Ins. Co. v. Model Family Laundries, Inc., 133 Conn. 433, 437 (1947) ("One cannot recover upon a contract unless he has fully performed his own obligation under it."). It is well-settled that "a total breach of the contract by one party relieves the [other] party of any further duty to perform further obligations under the contract." Shah v. Cover-It, Inc., 86 Conn. App. 71, 75 (2004); see Weiss v. Smulders, 313 Conn. 227, 263–64 (2014) ("Under contract law, it is well settled that a material breach by one party discharges the other party's subsequent duty to perform on the contract."); Bernstein v. Nemeyer, 213 Conn. 665, 672 (1990) (holding that a material breach by one party to a contract relieves the other party to the contract of any further duty to perform). "The determination of whether a contract has been materially breached is a question of

fact[.]" Chicago Title Ins. Co. v. Bristol Heights Ass'n, LLC, 2009 WL 5698103, at *6 (Conn. Super. Ct. Dec. 30, 2009) (quoting Efthimiou v. Smith, 268 Conn. 487, 493 (2004)). The summary judgment record demonstrates that Plaintiff materially breached the Forbearance Agreement when she made only three payments, thereby excusing Wells Fargo from its obligations to perform under the Agreement.

On June 27, 2011, Plaintiff signed and returned the Forbearance Agreement to Wells Fargo. SOF ¶¶ 46-47. Under its clear terms, Plaintiff was required to make four monthly payments — three payments of $304.11 and a fourth payment of $47,556.82. SOF ¶ 41. Plaintiff's handwritten notes on the Agreement confirm that she read all three pages of the Agreement, including the cover letter. SOF ¶¶ 45-46. Plaintiff made the first three payments of $304.11 for July through September 2011 as required under the Agreement. SOF ¶ 48. However, Plaintiff did not make the fourth required payment of $47,556.82 in October 2011. SOF ¶ 49. Consequently, Plaintiff, rather than Wells Fargo, breached the Forbearance Agreement because Plaintiff failed to perform her material obligations. Thus, because Plaintiff materially breached the Agreement, Wells Fargo was excused from performing. See Shah, 86 Conn. App. at 75.

Young v. Wells Fargo Bank, N.A., 109 F.Supp.3d 387 (D. Mass. 2015) is instructive on the issue of material breach by a borrower. In Young, a borrower entered into a Trial Payment Plan agreement ("TPP") under which she was required to make three timely payments. Young, 109 F.Supp. 3d at 391. Upon the successful completion of the TPP, Wells Fargo would consider her for a HAMP loan modification. Id. The Young court held that because the plaintiff/borrower made the trial payments late, she materially breached the contract, which excused Wells Fargo from further performance,

and "renders [Wells Fargo] not liable to [the borrower] for damages arising from the nonperformance of that obligation." Id. Similarly, in the current action, the undisputed evidence establishes that Plaintiff failed to make the four required payments under the Forbearance Agreement. SOF ¶¶ 41, 46-49. Plaintiff, like the borrower in Young, materially breached the Agreement. Accordingly, because Plaintiff materially breached the Forbearance Agreement, Wells Fargo was "relieved" from further performance, including providing Plaintiff with a permanent loan modification. Likewise, Wells Fargo is "not liable to Plaintiff for damages arising from the nonperformance of that obligation."

Recognizing her own material breach, Plaintiff attempts to muddy the waters by fabricating the existence of an agreement requiring only three (3) payments rather than four (4) payments. In her Complaint, Plaintiff relies upon the 3-payment version of the agreement to assert her claims. See Complaint, DN 48. The Court, at the motion to dismiss stage, was required to accept as true Plaintiff's claim that the 3-payment version of the agreement existed.[6] See MTD Order, DN 64; Counsel's Aff. Exhibit B-11, *3-Payment Agreement*. Through discovery, however, it has been conclusively proven that Plaintiff has fabricated the 3-payment version of the agreement. SOF ¶¶ 46-47.[7] Wells Fargo's 4-payment version of the agreement is the only agreement containing Plaintiff's signature and her own hand-written note confirming inclusion of one payment. SOF ¶¶ 46-47, 50; see Counsel's Aff. Ex. B-1, 195:20-24, 196:2-3, 198:4-200:6, 202:15-19; Counsel's Aff. Ex. B-11. Plaintiff merely alleges the existence of the three payment

[6] In Opposition to Wells Fargo's Motion to Dismiss, Plaintiff attached a copy of an *unsigned* 3-payment agreement to support her claims, which the Court accepted as true. SOF ¶¶ 123-124.

[7] Plaintiff has not produced any evidence of a 3-payment agreement or any evidence of a telephone call with Wells Fargo in which they purportedly discussed the Forbearance Agreement, including the date of the call and/or the identify of the Wells Fargo representative. See Counsel's Aff. Ex. B-1, 205:22-206:7, 210:13-211:4; Counsel's Aff. Ex. B-6, No. 12; Counsel's Aff. ¶ 8.

agreement - she has no real evidence to support that unfounded claim. Id.[8] See Counsel's Aff. Ex. B-1, 191:17-193:, 195:20-196:9 (claiming she did not sign a 4-payment agreement), 197:17-198:4, 202:15-24 (claiming she sent Wells Fargo a signed 3-payment agreement), Id. Wells Fargo attempted to obtain a copy of a *signed* 3-payment agreement from Plaintiff through its request for production of documents and a specific request at Plaintiff's deposition. See Counsel's Aff. Ex. B-1, 195:20-24, 196:2-3, 210:13-211:4. Notwithstanding Wells Fargo's efforts, Plaintiff did not produce any copy of a *signed* 3-payment agreement. See Counsel's Aff. Ex. B-1, 210:13-211:4; Counsel's Aff. Ex. B-6, No. 12; Counsel's Aff. ¶ 8. Wells Fargo has no record of a signed 3-payment agreement. SOF ¶ 50. The only *signed* Forbearance Agreement requires four payments.[9] SOF ¶¶ 39, 46, 50.

Plaintiff relies upon self-serving, unsubstantiated assertions to reinforce her claim that she did not sign Forbearance Agreement. For example, at her deposition, Plaintiff was asked, "Now, I need you to tell me exactly how it is that you believe that there is any other agreement out there that doesn't have that [fourth] payment on it that Wells Fargo sent you?" See Counsel's Aff. Ex. B-1, 195:20-24, 196:2-3. Plaintiff responded simply, "Because of the 47,000. I would never have agreed to that, never." Id. An unsigned 3-payment agreement and unsubstantiated assertions that a signed copy

[8] See also Counsel's Aff. Ex. B-1, 191:17-193:, 195:20-196:9 (claiming she did not sign a 4-payment agreement), 197:17-198:4, 202:15-24 (claiming she sent Wells Fargo a signed 3-payment agreement)

[9] To reconcile the existence of the signed 4-payment Forbearance Agreement and the unsigned 3-payment agreement, Plaintiff makes the serious accusation that Wells Fargo altered the Forbearance Agreement to include her signature as part of a cover-up for its misconduct. Counsel's Aff. Ex. B-1, 196:10-197:12, 201:20-202:3. Like all of her other claims, Plaintiff has no evidence to support this claim. See Id. at 196:20-198:4. In fact, when asked what evidence she has that Wells Fargo has altered the Forbearance Agreement, Plaintiff responded "This document is the evidence … This is evidence that there's something wrong because I would not have signed[.]" Id. at 196:17-197:4. When pressed further to provide the proof that the Forbearance Agreement is fraudulent, Plaintiff stated, "Again, I'm the proof of it because I know I didn't sign with that amount of money hanging over my head." Id. at 197:7-16.

exists are not sufficient to create a *genuine* issue of material fact regarding the terms of the Forbearance Agreement or the enforceability of the 4-payment Agreement. At summary judgment, Plaintiff cannot succeed by relying on her pleadings, mere conclusory assertions or on "some metaphysical doubt" as to a material fact. See Fed. R. Ci. P. 56(c); Matsushita Elec. Indus. Co., 475 U.S. at 586; Claude, 2015 WL 5797007, at *7. That is all Plaintiff has done here. Therefore, because Plaintiff failed to adduce evidence of the existence of a *signed*, enforceable 3-payment agreement, there is no *genuine* issue of material fact regarding the terms of the Forbearance Agreement or that Plaintiff failed to perform thereunder.

## D. The Record Indisputably Disproves Plaintiff's Allegations Supporting Her Negligent Misrepresentation, NIED and Unfair Trade Practices Claims.

### *1. Plaintiff's CUTPA, Negligent Misrepresentation, And NIED Claims Fail To The Extent Each Relies On Plaintiff's Failed Breach Of Contract Claim.*

As an initial matter, to the extent that Plaintiff's claims for negligent misrepresentation, unfair trade practices, and NIED are based on Plaintiff's failed breach of contract claim, these claims must similarly fail.[10] In denying the motion to dismiss, the Court, in part, relied on the following facts, set forth in Plaintiff's Complaint:

Negligent Misrepresentation

- "After the parties signed the Agreement, Plaintiff made the three payments she was obligated to make under the agreement and Defendant refused to honor its end of the bargain by modifying Plaintiff's loan." See Complaint, DN 48, ¶ 10; MTD Order, DN 64, p. 17.
- Wells Fargo "then informed Plaintiff that she did not qualify for a modification using a formula under which it knew Plaintiff could not have qualified." See Complaint, DN 48, ¶ 19B; MTD Order, DN 64, p. 18.

[10] This argument applies only to the extent that the Forbearance Agreement is not rendered inadmissible under FRE 408.

CUTPA

- "Not only did Wells Fargo induce Plaintiff to make trial payments and then refuse to hold up its end of the bargain, it entered into the Agreement with Plaintiff knowing from the beginning that it was not going to offer her a modification." See Complaint, DN 48, ¶ 19B; MTD Order, DN 64, p. 14.
- Because Plaintiff made 3 payments under the Agreement, Wells Fargo was required to modify Plaintiff's loan, as described in breach of contract claim. See Complaint, DN 48, ¶ 19B; MTD Order, DN 64, p. 15.

NIED

- "[A]ccepting [Plaintiff's] trial period payments and then refusing to honor its agreement to modify her loan." See Complaint, DN 48, ¶ 12; MTD Order, DN 64, p. 19.

Each of these assertions are based on the proposition that Plaintiff was required to make only three payments under the Forbearance Agreement and that, upon her completion of the three payments, Wells Fargo breached the Forbearance Agreement by failing to modify Plaintiff's Loan. As described in detail above, such a characterization of the parties' Agreement is demonstrably false. See *supra*, pp. 14-18. The indisputable evidence establishes that Wells Fargo did not breach the Forbearance Agreement. SOF ¶¶ 39, 41, 45-50. Instead, *Plaintiff* materially breached the Agreement when she failed to make the four payments required thereunder. SOF ¶¶ 41, 46, 48-49. Because Plaintiff failed to perform the express requirements of the Agreement, Wells Fargo was excused from any obligation to perform thereunder. As a result, Plaintiff fails to establish any breach of contract claim against Wells Fargo for a purported breach of the Forbearance Agreement. Accordingly, to the extent Plaintiff relies on the purported breach of contract to establish a violation of CUTPA, negligent misrepresentation, or NIED, the claims fail because they are based solely on demonstrably inaccurate facts.

2. *Plaintiff's Negligent Representation Claim Fails Because Evidence Disproves The Factual Assertions In The Complaint Supporting Her Cause Of Action.*

In Connecticut, a claim for negligent misrepresentation requires that the plaintiff demonstrate the defendant: (1) made a misrepresentation of fact; (2) knew or should have known that [a representation] was false; (3) that the plaintiff reasonably relied upon the misrepresentation; and (4) that the plaintiff[] suffered pecuniary harm as a result thereof. Flemming v. Goodwill Mortg. Servs., LLC, 648 F.Supp. 2d 292, 295-96 (D. Conn. 2009) (quoting Glazer v. Dress Barn, Inc., 274 Conn. 33, 73 (2005)); see Sturm v. Harb Dev., LLC, 298 Conn. 124, 143 (2010) (internal quotation marks omitted). "[E]ven an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth." Id. (internal quotation marks omitted). To establish a claim for negligent misrepresentation, Plaintiff alleges the following in the Complaint:

- "A representative of Wells Fargo contacted [Plaintiff] in early 2011 and told her that Wells Fargo "had all the paperwork [it] needed to go forward with the HAMP [modification] and they would send the paperwork directly to underwriting with no further delays." See Complaint, DN 48, ¶ 9; MTD Order, DN 64, p. 17.
- "Based on [Wells Fargo's] representations, Plaintiff abandoned Mediation in expectation of a speedy resolution/approval from underwriting" See Complaint, DN 48, ¶ 10; MTD Order, DN 64, p. 18.
- "Instead, when Mediation closed Plaintiff's file, the delays and endless requests for paper-work [sic] started over again (and never ended)." Id.
- Wells Fargo "then informed Plaintiff that she did not qualify for a modification using a formula under which it knew Plaintiff could not have qualified." Id.
- "[B]y then, Wells Fargo had already recommenced the foreclosure action." See Complaint, DN 48, ¶ 19B; MTD Order, DN 64, p. 17.

Relying on these "facts," the Court found that Plaintiff pleaded a plausible claim that Wells Fargo represented that it would modify her loan, induced her to rely on that

promise knowing it was false, and caused her damage. See MTD Order, pp. 17-18. The "facts" alleged in the Complaint, however, turn out to be untrue.

Plaintiff's assertions that (1) "A representative of Wells Fargo contacted [Plaintiff] in early 2011 and told her that Wells Fargo "had all the paperwork [it] needed to go forward with the HAMP [modification] and they would send the paperwork directly to underwriting with no further delays," and (2) "Based on [these] representations, Plaintiff abandoned Mediation in expectation of a speedy resolution/approval from underwriting," are unsupported by any evidence from Plaintiff and directly contradicted by the summary judgment record.[11] In her deposition, Plaintiff asserted that she left mediation as the result of a call from Wells Fargo informing her that it had all the paperwork it needed to complete the HAMP loan modification review and that Wells Fargo would send the paperwork immediately to underwriting in the expectation that she would receive a loan modification. See Counsel's Aff. Ex. B-1, 186:4-25. Plaintiff failed, however, in her deposition or otherwise, to identify the date of the purported call or the identity of the Wells Fargo representative who purportedly made this call. SOF ¶ 35. Additionally, Wells Fargo has no record in its business records, call logs, or servicing notes that any such call occurred in early 2011 or that any such representation was made to Plaintiff. Id.

Moreover, notwithstanding Plaintiff's assertion, the summary judgment record contains undisputed evidence that the State Court Mediation was terminated, not because of a representation by Wells Fargo, but as a result of Plaintiff's failure to cooperate with the mediation process. In the mediator's Final Report, she stated that

[11] In addressing the purported representations made during ongoing settlement communications, Wells Fargo does not waive its objection that such assertions are inadmissible under FRE 408.

mediation was terminated because Plaintiff "has not submitted a complete financial package to [Wells Fargo] thru the mediation process. [Plaintiff] has been given extensive instructions and directions to complete the financial package. Mediator has made additional time outside of mediation to assist [Plaintiff] with completing the financial package." SOF ¶ 36. This directly refutes Plaintiff's unsubstantiated claim that *Plaintiff* ended the mediation as the result of Wells Fargo's purported representation. Instead, this undisputed evidence confirms that mediation was terminated by the *mediator* as a result of *Plaintiff's* conduct. See Counsel's Aff. Ex. B-1, 186:4-25. Accordingly, because Plaintiff failed to adduce any evidence supporting her claim regarding the purported misrepresentation, and the record contains evidence that directly contradicts her claims, Plaintiff cannot establish a *genuine* issue of material fact and cannot proceed on this claim.

Additionally, the remaining assertions that (1) "when Mediation closed Plaintiff's file, the delays and endless requests for paper-work [sic] started over again (and never ended)," (2) Wells Fargo "then informed Plaintiff that she did not qualify for a modification using a formula under which it knew Plaintiff could not have qualified," and (3) "[B]y then, Wells Fargo had already recommenced the foreclosure action," similarly fail because they are not supported by evidence. First, after the State Court Mediation, "the delays and endless requests for paper-work" did not "start over again" as Plaintiff suggests. Rather, the undisputed evidence shows that after the State Court Mediation ended, Wells Fargo completed at least five separate HAMP and non-HAMP reviews to

help her avoid foreclosure, one of which resulted in the Forbearance Agreement.[12] SOF ¶¶ 37-39, 51-53, 56-64. Although the majority of reviews did not result in a modification, each review required Plaintiff to submit updated financial documents relating to herself as well as any contributors to her income such as tenants. SOF ¶ 68. When a modification review was completed, Wells Fargo promptly informed Plaintiff of its decision by letter. SOF ¶¶ 37-38, 62, 64-65. Any delay in a decision on the modification was a result of Plaintiff's failure to provide the necessary documents to promptly complete the review. SOF ¶¶ 52-53, 56-59; see also SOF ¶¶ 23-28.

For example, in October 2011, Wells Fargo reviewed Plaintiff for a HAMP loan modification, notwithstanding her failure to complete the Forbearance Agreement. SOF ¶ 51. Over the course of five months, Wells Fargo attempted to obtain the necessary financial documents from Plaintiff on at least five separate occasions to complete the review to no avail. SOF ¶¶ 52-53, 56-59. In its letters, Wells Fargo requested financial documents about not only about Plaintiff's personal finances, but also from her tenant, Marlene, to confirm Plaintiff's rental income. Id. Plaintiff and her tenant refused to cooperate and send Wells Fargo the necessary documentation; therefore, it was forced to deny the modification. SOF ¶ 61. Thus, the delays and requests for paperwork were not "endless," but rather several separate attempts to help Plaintiff avoid foreclosure.

Second, Wells Fargo did not "then inform[] Plaintiff that she did not qualify for a modification using a formula under which it knew Plaintiff could not have qualified." There is no support for this assertion anywhere in the summary judgment record. After the State Court Mediation ended, Wells Fargo informed Plaintiff that she did not qualify

[12] Aside from the Forbearance Agreement that was sent to Plaintiff on June 16, 2011, Wells Fargo sent Plaintiff letters denying eligibility for a HAMP modification on May 16, 2011, March 28, 2012, and June 12, 2012, and a Non-HAMP denial on July 30, 2012. SOF ¶¶ 37-38, 62-65.

for a HAMP loan modification because "Wells Fargo was unable to create an affordable payment equal to 31% of Plaintiff's reported monthly gross income without changing the terms of Plaintiff's loan beyond the requirements of the HAMP program." SOF ¶¶ 37-38. Furthermore, in each additional HAMP or Non-HAMP denial, Wells Fargo informed Plaintiff that she did not qualify for a modification either because she did not provide the required documents, the investor declined to modify her loan, or it could not create an affordable payment under HAMP. SOF ¶ 27-28, 62, 64-65. The mere fact that Plaintiff was denied on multiple occasions for a modification is not evidence that Wells Fargo *knew* she would not qualify for a modification, especially when each review was based upon updated financial documentation. SOF ¶ 68.

Lastly, Plaintiff's claim that "Wells Fargo had already recommenced the foreclosure action" is a complete misunderstanding of the foreclosure and modification process. Wells Fargo initiated the Foreclosure Action on August 6, 2010. SOF ¶ 29. This was two days after Wells Fargo sent Plaintiff a letter informing her that she did not qualify for a HAMP loan modification. SOF ¶¶ 28-29. The Foreclosure Action has remained pending since it was filed in 2010. SOF ¶ 30. At no time since that date has Wells Fargo dismissed the Foreclosure Action and refiled it. Id. However, while the parties engaged in attempts to modify the loan to avoid foreclosure from 2010 through at least 2012, Wells Fargo did not actively pursue the Foreclosure Action. Id. In fact, the Foreclosure Action lay nearly dormant until March 11, 2013 when Wells Fargo filed its motion for judgment of strict foreclosure, which was long after modification efforts ceased. See Penno Aff. ¶¶ 16-21, 23-24, 32-41; Counsel's Aff. Ex. B-9. Thus, there is no evidence to support any claim that the foreclosure action was "recommenced" during

the modification review process. Accordingly, because Plaintiff has not presented any evidence to support her claims for negligent misrepresentation, and each claim is indisputably refuted by the summary judgment record, the negligent misrepresentation claim fails and Wells Fargo is entitled to judgment as a matter of law.

3. *Plaintiff's CUTPA Claim Fails Because Evidence Disproves The Factual Assertions In The Complaint Supporting Her Cause Of Action.*

Under CUTPA, Conn. Gen. Stat. § 42-110b(a), "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." To determine whether an act or practice violates CUTPA, courts consider the following factors:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise … ; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers.

Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc., 296 Conn. 315, 350 (2010) (internal quotation marks omitted). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Harris, 296 Conn. at 350–51. Here, the summary judgment record does not support Plaintiff's claims that Wells Fargo engaged in unfair trade practices in violation of CUTPA .

In denying the motion to dismiss, the Court relied on the following facts to establish a plausible claim under CUTPA:

- "Not only did Wells Fargo induce Plaintiff to make trial payments and then refuse to hold up its end of the bargain, it entered into the Agreement with Plaintiff knowing from the beginning that it was not going to offer her a modification." See Complaint, DN 48, ¶ 19B, MTD Order, DN 64, p. 14.

- Wells Fargo "intentionally dragged out its process of the modification agreement in order to increase Plaintiff's debt, to its benefit." Id.
- "[A]fter inducing [Plaintiff] to abandon mediation, enter into the Agreement, and make three trial payments, [Wells Fargo] recommenced foreclosure proceedings before it even notified her that it was not going to modify her loan and then refused to refund the trial payments Plaintiff had made." Id.

Like the allegations from Plaintiff supporting her negligent misrepresentation that the Court accepted at true, the "facts" that Plaintiff alleges to support her CUTPA cause of action are also not true or accurate.

First, there is no evidence to support the claim that Wells Fargo "induced" Plaintiff to enter the Forbearance Agreement with the intention not to perform. Or that it entered the agreement "knowing from the beginning that it was not going to offer [Plaintiff] a modification." After failing to qualify for a HAMP loan modification in May 2011, Wells Fargo offered Plaintiff the Forbearance Agreement. SOF ¶ 39. The *signed* Forbearance Agreement required, on its face, that Plaintiff make four payments, and that subject to Plaintiff's performance under the Agreement, Wells Fargo would review Plaintiff for a HAMP loan modification. SOF ¶¶ 40-44. Despite failing to make the four required payments, Wells Fargo reviewed Plaintiff for a HAMP modification in October 2011. SOF ¶ 51. Wells Fargo, however, was not able complete the review because Plaintiff, over the course of five months, failed to provide the documents necessary to complete the review. SOF ¶ 62. Plaintiff has no evidence to prove that Wells Fargo "induced" her to enter the Forbearance Agreement without the intention to honor its terms or that Wells Fargo never intended to modify Plaintiff's loan.

Second, Wells Fargo did not "intentionally drag[] out" its modification process "in order to increase Plaintiff's debt." Rather, Wells Fargo has completed at least seven separate loss mitigation reviews of Plaintiff's Loan since March 2010 to help her avoid

foreclosure. SOF ¶¶ 66-67. It was not able to grant Plaintiff a modification because she either failed to qualify for the modification, the investor declined to modify the Loan, or she failed to provide the required documents to complete the review. SOF ¶¶ 37-38, 62-67. Furthermore, during this time, Plaintiff did not make any payment on the Mortgage Loan or cure the default, which eroded the equity in the Property. SOF ¶¶ 14, 82. Aside from a conclusory assertion that it intentionally dragged out the process, Plaintiff has no proof to support this contention.

Lastly, Wells Fargo did not induce Plaintiff to abandon mediation and "recommence" foreclosure proceedings "before it even notified her it was not going to modify her loan." As described in detail above, Wells Fargo did not induce Plaintiff to abandon mediation. Rather, the State Court Mediation was terminated as a result of Plaintiff's failure to cooperate and provide Wells Fargo the documents necessary to complete the modification. SOF ¶ 36. Further, Plaintiff's characterization that Wells Fargo "recommenced" foreclosure without notifying her of the modification decision is entirely inaccurate. Wells Fargo first reviewed Plaintiff for a HAMP loan modification in May 2010. SOF ¶ 22. Plaintiff, however, did not qualify for the modification because she did not provide Wells Fargo with the necessary documents to complete the review. SOF ¶¶ 23-26 . Plaintiff was informed of the HAMP loan modification denial on August 4, 2010. SOF ¶¶ 27-28. Two days later, on August 6, 2010, Wells Fargo commenced the Foreclosure Action. SOF ¶ 29. Thus, Wells Fargo informed Plaintiff of its decision before commencing foreclosure. Thereafter, upon the completion of each subsequent HAMP loan modification or Non-HAMP review, of which there were at least five, Wells Fargo promptly notified Plaintiff of its decision. SOF ¶ 37-39, 62, 64-65.

Moreover, Wells Fargo did not "recommence" foreclosure after any loan modification denial. Between 2010 and 2012, the Foreclosure Action remained active (and it remains pending to this date). SOF ¶ 30. Merely filing a foreclosure action and engaging in extra-judicial settlement efforts, including loan modification reviews, cannot be the type of conduct that can establish an unfair trade practice claim. Indeed, filing the foreclosure action is indisputably a lawful activity. Accordingly because the summary judgment record disproves Plaintiff's assertions set forth in the Complaint and Plaintiff failed to adduce any evidence of her own, Plaintiff's CUTPA claim fails and Wells Fargo is entitled to judgment as a matter of law.

4. *Plaintiff's NIED Claim Fails Because Evidence Disproves The Factual Assertions In The Complaint Supporting Her Cause Of Action.*

In Connecticut, there are four elements to a negligent infliction of emotional distress ("NIED") claim: (1) "the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress[;] [2] the plaintiff's distress was foreseeable[;] [3] the emotional distress was severe enough that it might result in illness or bodily harm[;] and[] … [4] the defendant's conduct was the cause of the plaintiff's distress." Olson v. Bristol-Burlington Health Dist., 87 Conn. App. 1, 5 (2005) (citing Carrol v. Allstate Ins. Co., 262 Conn. 433, 446 (2003)). Unlike claims for intentional infliction of emotional distress, an NIED claim does not need to be based upon extreme and outrageous conduct. Id. at 7. To establish a claim for NIED, Plaintiff pleaded the following facts in her Complaint, which the Court assumed to be true at the motion to dismiss stage:

- Wells Fargo's "alleged conduct in inducing Plaintiff to end the mediation process on the promise that she would be able to modify her loan." See Complaint, DN 48, ¶ 8; MTD Order, DN 64, p. 18-19.

- "[S]tringing [Plaintiff] along for a year, all the while knowing that it was not going to modify her loan." See Complaint, DN 48, ¶ 19B; MTD Order, DN 64, p. 19.
- "[R]equesting that [Plaintiff] send Wells Fargo hundreds of documents." See Complaint, DN 48, ¶ 12; MTD Order, DN 64, p. 19.
- "[F]orcing [Plaintiff] to repeatedly begin the process anew with numerous different representatives." Id.
- "[R]ecommencing foreclosure proceedings without even notifying Plaintiff that she had not qualified for a modification." Id.

These assertions, which are identical to those relied upon in Plaintiff's negligent misrepresentation and CUTPA claims, fail for the same reasons articulated more fully above. Namely, the undisputed summary judgment record disproves each of the above assertions as factually incorrect. See supra, pp. 19-28. Accordingly, because Plaintiff failed to adduce any evidence to support her claims or create a genuine issue of material fact, her NIED claim fails and Wells Fargo is entitled to judgment as a matter of law.

E. The Summary Judgment Record Is Devoid Of Any Evidence To Support Plaintiff's Claims For Damages.

Notwithstanding the above, Plaintiff's claims cannot survive summary judgment because Plaintiff failed to adduce any evidence to support her claim for damages. Damages, or a reasonable estimate thereof, are an essential element of a breach of contract, negligent misrepresentation, CUTPA, and NIED. See McMann Real Equities Series XXII, LLC, 93 Conn. App. at 504 (stating damages is an essential element of a breach of contract claim); Olson, 87 Conn. App. at 5 (holding NIED requires proof of severe emotional distress that might result in illness or bodily harm); Reader v. Cassarino, 51 Conn. App. 292, 299 (1998) ("A party seeking to recover damages under CUTPA must … present evidence providing the court with a basis for a reasonable

estimate of the damages suffered."); Flemming, 648 F.Supp. 2d at 295-96 (holding negligent misrepresentation requires proof that the plaintiff suffered pecuniary harm). Here, Plaintiff asserts that her damages in this action are as follows:

- Mental anguish and distress and pain and suffering, such as difficult sleeping, physical pain, headaches, increased blood pressure and vision problems. See Counsel's Aff. Ex. B-12, ¶¶ A, B.
- Compensatory Damages:
  - $72,200 for lost rental income from Plaintiff's in-law apartment at approximately $1,000 to $1,200 per month for approximately six years. Id. at ¶ C2.
  - $25,900 for "loss of income from a reverse mortgage. Id. at ¶ C3.
  - $300,000 for the loss of the Property, including equity. Id. at ¶ C4.

The summary judgment record, however, does not establish any entitlement to the above described damages.

First, Plaintiff failed to produce any evidence to support her claim that she suffers mental and emotional distress and/or physical pain and suffering in the form of difficulty sleeping, headaches, increased blood pressure, and vision problems. In its interrogatories, Wells Fargo specifically asked Plaintiff to "state the basis for each and every category of damages you are seeking from Wells Fargo" and to "identify with specificity all facts, documents, and evidence that you contend supports your claim for damages." See Counsel's Aff. Ex. B-2, No. 21. In response, Plaintiff simply stated, "[t]he amount [sic] in damages for Pain and Suffering I believe [sic] will be decided by the trier of fact/the Court, and should be an amount consistent [sic] with damages in cases similar in kind." SOF ¶ 69. She did not identify any evidence to support her claim as requested. Furthermore, in its request for production of documents, Wells Fargo requested that Plaintiff produce "any and all documents concerning Plaintiff's allegedly severe emotional distress" and "any and all documents concerning Plaintiff's claim that

she suffered emotional distress." See Counsel's Aff. Ex. B-6, No. 21, 22. Plaintiff did not produce any documents related to her emotional distress or physical pain and suffering. SOF ¶ 70. In fact, at her deposition, Plaintiff acknowledged that she did not produce such documents to prove her claim for emotional distress or physical pain and suffering because such documents do not exist. SOF ¶¶ 70-71. Specifically, when asked whether Plaintiff has any medical records from doctors who have treated her for medical conditions that have been caused by the foreclosure she said, "Well, let me put it this way. I don't talk about my problems to anyone, not even my doctor." SOF ¶ 71. Further, at the deposition, Wells Fargo requested Plaintiff produce any medical records reflecting her emotional distress and physical pain and suffering within fourteen days. Id. Plaintiff responded, "Well, I'm not going in and tell a doctor that Wells Fargo has played their dirty tricks with me and its gotten to my health. I mean, isn't it obvious that people are going through this kind of stress." Id. To date, Plaintiff has not produced any evidence of her emotional distress and physical pain and suffering aside from her own conclusory and unsubstantiated statements. As such, Plaintiff's NIED claim must fail because severe emotional damages are an essential element of the claim.

Next, Plaintiff asserts that she is entitled to damages in the amount of $72,200 for lost rental income from her in-law apartment in the Property at approximately $1,000 to $1,200 per month for approximately six years. Plaintiff, however, did not adduce any evidence to support such a claim. First, despite claiming that the in-law apartment has a fair rental value of $1,000 to $1,200, Plaintiff did not produce any evidence to support this contention. In its request for production of documents, Wells Fargo requested that Plaintiff produce "any and all documents concerning damages Plaintiff seeks to recover

in this Action." See Counsel's Aff. Ex. B-6, No. 20. Plaintiff did not produce any documents, such as an appraisal or a past lease agreement, to support the contention that the in-law apartment has a fair rental value of $1,000 to $1,200. SOF ¶¶ 73-74.

Further, Plaintiff stated that she did not have a tenant renting the in-law apartment prior to the foreclosure action. SOF ¶¶ 8, 74-75. In the past five years, Plaintiff can identify only three tenants, all of whom are relatives, who have stayed in the in-law apartment. First, Plaintiff's son, Daniel, who uses the in-law apartment as his primary address, stays in the rental unit periodically, but does not pay any rent. SOF ¶ 76. Second, after commencing the Foreclosure Action, Plaintiff states that her grandson, Gregory Gill, rented the in-law apartment for three months so that she could obtain more income so that she could qualify for the Forbearance Agreement. SOF ¶ 77. She entered into a written lease agreement with Mr. Gill, but the lease was not produced in discovery and Plaintiff cannot recall how much rental income she received. SOF ¶¶ 77-79. Third, Plaintiff rented the in-law unit to her daughter-in-law, Marlene. SOF ¶¶ 54. Although Marlene was renting the in-law apartment from at least October 2011 through March 2012, Plaintiff stated that she otherwise does not recall when Marlene rented the apartment, the amount of the rent Marlene paid for the apartment, or the number of times Marlene rented the apartment.[13] SOF ¶ 55. Plaintiff and Marlene, however, never entered into a written lease agreement. SOF ¶ 54. Aside from the above, Plaintiff admitted that she does not have specific knowledge about when she had tenants, the identity of her tenants, or how much rental income she collected for her

[13] It is known that Marlene rented the in-law unit during this time period because Wells Fargo requested documents regarding Marlene's financial contributions to Plaintiff's income when Wells Fargo reviewed for a HAMP loan modification in October 2011. SOF ¶ 53-54, 56-59. Plaintiff's modification was ultimately denied because Marlene refused to provide documents regarding her financial contributions. SOF ¶ 61.

in-law apartment unit because her sons handled the rental unit. SOF ¶ 72. Thus, despite claiming she is entitled to "lost rent," Plaintiff has not produced any evidence, through production of documents or oral testimony, to support the contention that she lost $72,200 in rental income as a result of the foreclosure.

Third, Plaintiff claims that she is entitled to $25,900 for "loss of income" from a reverse mortgage. However, by Plaintiff's own admission, she never applied for a reverse mortgage with Wells Fargo. SOF ¶¶ 11, 34, 81. Moreover, a reverse mortgage is a loan. It is not income to which Plaintiff is entitled simply because she defaulted. Absent an accepted application for a reverse mortgage, Plaintiff cannot provide any basis for her claim that she was entitled to the proceeds from a reverse mortgage.

Lastly, Plaintiff seeks damages in the amount of $300,000 for "loss of the Property, including equity." Plaintiff, however, cannot assert an entitlement to such an amount because she has not made a full payment on the Loan or cured the outstanding balance since she entered default more than six years ago in March 2010. SOF ¶¶ 14, 81. Further, as a result her default, Wells Fargo obtained judgment of strict foreclosure on the Property on August 31, 2015. SOF ¶ 90. Plaintiff is therefore not entitled damages for the "loss of the Property," because she is no longer entitled to possession of the Property. See Connecticut Practice Book § 23-17(b)(2) (stating that upon entry of judgment of strict foreclosure, the foreclosing party is entitled to possession of the Property). Furthermore, with regard to the loss of equity, Plaintiff has not produced any evidence regarding the value of the property in either 2010 or the present. SOF ¶ 83. Therefore, there is no basis in the record to support her claim for $300,000 in damages.

## III. CONCLUSION

For the reasons set forth above, Wells Fargo respectfully prays that this Court grant its Motion for Summary Judgment, enter judgment in Wells Fargo's favor dismissing Plaintiff's Complaint in its entirety, and grant Wells Fargo any further relief this Court deems equitable and just.

Respectfully submitted,
Wells Fargo Bank, N.A.,
by its attorney,

*/s/ Sean R. Higgins*________________
Sean R. Higgins (Bar No. ct28279)
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Phone: 617-261-3100
Fax: 617-261-3175

Dated: September 29, 2016

## CERTIFICATE OF SERVICE

I, Sean R. Higgins, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Dated: September 29, 2016 *-/s/ Sean R. Higgins*________________