UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GENEVIEVE HENDERSON,<br>*Plaintiff*,<br>*v.*<br>WELLS FARGO BANK, N.A.,<br>*Defendant.* | Civil No. 3:13cv378 (JBA)<br><br>February 21, 2017 |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This suit, brought by pro se Plaintiff Genevieve Henderson ("Ms. Henderson") against Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), alleges breach of contract, unfair trade practices, misrepresentation and infliction of emotional distress, arising out of Wells Fargo's foreclosure on Plaintiff's house. [1]  (*See* Fourth Am. Compl. [Doc. # 48].) Wells Fargo now moves [Doc. # 94] for summary judgment on all of Ms. Henderson's claims. For the following reasons, Defendant's Motion is granted.

**I. Background** [2]

**A. Undisputed Facts**

**1.  *The Origination of the Loan and the Default***

On December 31, 2007 Plaintiff refinanced an existing mortgage on her home located in Middlefield, Connecticut (the "Property") by executing a promissory note to Wachovia Mortgage

---

[1] Plaintiff's Complaint also contained a count alleging fraudulent, unlawful and/or abusive commencement of foreclosure action, but this count was dismissed. (*See* Ruling [Doc. # 64] on Defendant's Motion to Dismiss at 19.)

[2] The Court's Ruling [Doc. # 109] on Defendant's Motion [Doc. # 106] to Strike certain exhibits to Plaintiff's Opposition [Doc. # 100] to Summary Judgment and certain portions of Plaintiff's Affidavit [Doc. # 102] contains additional procedural background.

Corporation ("Wachovia") in the principal amount of $180,000. (*See* Ex. A-1 (Note) to Penno Aff. [Doc. #94-3].) Wells Fargo subsequently acquired Wachovia and took over the loan. (*See* Ex. B-1 (Henderson Tr.) to Counsel's Aff. [Doc. # 94-4] at 91:18-92:3; Ex. B-7 (Mulder Aff.) to Counsel's Aff. ¶ 4.) In early 2010 Plaintiff contacted Wells Fargo to inquire about a reverse mortgage or a loan modification in an effort to avoid default because she could no longer afford her monthly payments. (*See* Henderson Tr. at 94:9-24, 109:2-21.) During that conversation Plaintiff was advised that Wells Fargo could review her for a HAMP (the "Home Affordable Modification Program") loan modification, (Def.'s D. Conn. L. Civ. R. 56a(1) Stmt ¶ 20 ("Def.'s LR 56"); Pl.'s D. Conn. L. Civ. R. 56a(2) Stmt ¶ 20 ("Pl.'s LR 56").) However, Plaintiff did not submit any documents at that time, but instead allegedly provided information over the phone. (Henderson Tr. at 109:22-25.)

At no time did Wells Fargo instruct or advise Plaintiff to cease making payments on the mortgage. (Def.'s LR 56 ¶ 15; Pl.'s LR 56 ¶ 15; Henderson Tr. at 109:4-14.) However, Plaintiff defaulted on the loan in March 2010 after failing to make the required monthly payment. (Def.'s LR 56 ¶ 12; Pl.'s LR 56 ¶ 12.)[3] Ms. Henderson also failed to make the required payment in April 2010. (Def.'s LR 56 ¶ 13; Pl.'s LR 56 ¶ 13.) As a result of the default, Wells Fargo sent Plaintiff an acceleration notification dated April 18, 2010 informing her that the loan was in default for failure to make the required payments and that unless she paid the amount past due Wells Fargo would accelerate the loan. Plaintiff has not made a full monthly payment, nor cured the default, since missing the March 2010 payment. (Def.'s LR 56 ¶14; Pl.'s LR 56 ¶ 14.) At some point in April or May 2010 Ms. Henderson did attempt to make the May payment in an effort to avoid foreclosure

---

[3] Paragraph 12 of Plaintiff's LR 56 Statement begins "DENY" but then clarifies that Plaintiff does not dispute that she defaulted at that time, but only any implication by Defendant "that Plaintiff was trying to refinance prior to March, 2010." (Pl.'s LR 56 ¶ 12.)

but Wells Fargo refused to accept it because Plaintiff was required to pay the total amount necessary to bring the loan current in light of her nonpayment. (Def.'s LR 56 ¶¶ 17-18; Pl.'s LR 56 ¶¶ 17-18.)

Then, in May 2010 Wells Fargo began reviewing Ms. Henderson for a HAMP.[4] (Def.'s LR 56 ¶ 22.) Plaintiff admits that Wells Fargo never guaranteed or promised her that she would be eligible for, qualify for, or receive a loan modification, although she contends that it did lead her to believe she would qualify for the HAMP modification. (Pl.'s LR 56 ¶ 21.)

### 2.   *The Foreclosure Action and Mediation*

On August 6, 2010 Wells Fargo initiated a foreclosure action against Plaintiff in Connecticut state court. (Def.'s LR 56 ¶ 29; Pl.'s LR 56 ¶ 29.) On March 11, 2013 Wells Fargo filed a motion for judgment of strict foreclosure. (Def.'s LR 56 ¶ 84; Pl.'s LR 56 ¶ 84.) Plaintiff then commenced the instant action on March 19, 2013. (Def.'s LR 56 ¶ 85; Pl.'s LR 56 ¶ 85.) On August 31, 2015, the state court entered judgment of strict foreclosure in Wells Fargo's favor. (Def.'s LR 56 ¶ 90; Pl.'s LR 56 ¶ 90.) Ms. Henderson subsequently appealed that decision to the Connecticut Appellate Court where it is currently pending. (Def.'s LR 56 ¶ 91; Pl.'s LR 56 ¶ 91.)

As part of the Foreclosure action, Wells Fargo and Ms. Henderson participated in the Connecticut state court foreclosure mediation program (the "Mediation") with the purpose of attempting to resolve the Foreclosure Action before it went to judgment. (Def.'s LR 56 ¶ 31; Pl.'s LR 56 ¶ 31.) Plaintiff and Defendant attended and participated in several mediation sessions

---

[4] Plaintiff is not sure of the dates Defendant attempted to modify her loan and thus does not admit this fact. (*See* Pl.'s LR 56 ¶ 22.) For the reasons discussed *infra* at Section (I)(B), the evidence of record supports Wells Fargo's claim that they began her HAMP review for the first time in May 2010.

between September 2010 and May 2011, during which they actively negotiated potential settlement options including, but not limited to, considering Plaintiff for a HAMP loan modification or other non-HAMP options. (Def.'s LR 56 ¶ 32; Pl.'s LR 56 ¶ 32.). Plaintiff never filled out or submitted an application for a reverse mortgage with Wells Fargo. (Def.'s LR 56 ¶ 34; Pl.'s LR 56 ¶ 34; Henderson Tr. at 188:2-4.) The formal Mediation ended on May 10, 2011, the reason for which is disputed.[5] (Ex. B-10 (Foreclosure Mediator's Final Report) to Counsel's Aff.)

### 3. The Forbearance Agreement

Nearly a month after the Mediation ended Wells Fargo offered Ms. Henderson the Special Forbearance Agreement (the "Forbearance Agreement" or the "Agreement"). (*See* Ex. A-10 (the "Four-Payment Agreement") to Penno Aff.) The parties agree that the Agreement was sent to Plaintiff in a three-page packet, which included a cover letter with instructions. (Def.'s LR 56 ¶ 40; Pl.'s LR 56 ¶ 40.) Under the Agreement, Wells Fargo agreed to "temporarily accept[ ] reduced installments . . . as outlined in section 5" of the Agreement. (Ex. A-3 to Pl.'s Opp'n to Def.'s Mot.

---

[5] Defendant claims that the Mediation was terminated because Plaintiff did not supply the necessary documents, (Def.'s LR 56 ¶ 36) while Plaintiff contends that Defendant induced her to terminate the Mediation by promising to modify her mortgage (Pl.'s Aff. [Doc. # 102] ¶¶ 11-12). The Mediator's Report indicates that the Mediation was "not settled/terminated." It goes on to note under "Issues Not Resolved" that Plaintiff "has not submitted a complete financial package to [Defendant] thru the [M]ediation process. [Plaintiff] has been given extensive instructions and directions to complete the financial package. Mediator has made additional time outside of [M]ediation to assist [Plaintiff] with completing the financial package." (Ex. B-10 to Counsel's Aff.) Defendant reads this to mean that the Mediation terminated because of Plaintiff's failure to submit the necessary documents. Plaintiff disputes this reading, alleging instead that while the Mediation was ongoing, she "was called by Defendant claiming they had all the paperwork they needed from me now, to put it directly into underwriting for a SPEEDY MODIFICATION if I left [M]ediation . . . Since all I wanted was to secure my home . . . I abandoned [M]ediation with the false promise of a speedy modification." (Pl.'s Aff. ¶¶ 11-12 (emphasis in original); *see also* Henderson Tr. at 186:7-187:1.) This remains a disputed fact, but ultimately turns out not to be material.

for Summary Judgment at 3; Ex. A-10 to Penno Aff. at 3.) Section 5 required Plaintiff to make four monthly payments — three payments of $304.11 and a fourth payment of $47,556.82. (Ex. A-10 to Penno Aff. at 3; Def.'s LR 56 ¶ 41.)

The Agreement warned that "[u]pon successful completion of the Agreement, [Plaintiff's] loan [would still] not be contractually current. (Ex. A-10 to Penno Aff. at 3.) Since the installments may be less than the total amount due, [Plaintiff] may still have outstanding payments and fees." (*Id.*) It continued: "Any outstanding payments and fees will be reviewed for a loan modification, based on investor guidelines, this will satisfy the remaining past due payments on your loan and we will send you a loan modification agreement. An additional payment may be required." (*Id.*) Section 3 of the Agreement stipulated: "The lender is under no obligation to enter into any further agreement, and this Agreement shall not constitute a waiver of the lender's right to insist upon strict performance in the future." (*Id.*) Under Section 4:

> All of the provisions of the Note and Security Instrument, except as herein provided, shall remain in full force and effect. Any breach of any provision of this Agreement or non-compliance with this Agreement, shall render the forbearance null and void. The lender, in its sole discretion and without further notice to [Plaintiff], may terminate this Agreement. If the Agreement is terminated the lender may institute foreclosure proceedings according to the terms of the Note and Security Instrument. In the event of foreclosure, [Plaintiff] may incur additional expenses of attorney's fees and foreclosure costs.

(*Id.*)

> The cover letter explained:

> This is not a waiver of the accrued or future payments that become due, but a trial period showing you can make regular monthly payments. . . . Any outstanding payments and fees will be reviewed for a loan modification. If approved for a loan modification, based on investor guidelines, this will satisfy the remaining past due payments on your loan and we will send you a loan modification agreement. An additional payment may be required. Any installments received will be applied to the unpaid principal balance on the loan. . . . If your loan is in foreclosure, we will

instruct our foreclosure counsel to suspend foreclosure proceedings once the initial installment has been received, and to continue to suspend the action as long as you keep to the terms of the Agreement. Upon full reinstatement, we will instruct our foreclosure proceedings [sic] and report to the credit bureaus accordingly.

(*Id.*)

Plaintiff signed and returned the Forbearance Agreement to Defendant on June 27, 2011, with handwritten notes on pages one and three of the Agreement that noted it was "sent certified mail return receipt" and that Plaintiff "enclosed [her] 1st installment of $304.11 (ck # 1093) due July 15, 2011 as set forth on Page 1, Paragraph 2 of this Agreement" respectively. (Def.'s LR 56 ¶ 46-47; Pl.'s LR 56 ¶ 46-47.) Plaintiff timely made all three of the payments of $304.11. (Def.'s LR 56 ¶ 41, 48; Pl.'s LR 56 ¶ 41, 48.) However, Ms. Henderson never made the much larger fourth payment. (Def.'s LR 56 ¶ 49; Pl.'s LR 56 ¶ 49.)

**B.  Facts That Defendant has Established for Purposes of Summary Judgment**

Defendant claims a series of facts that Plaintiff either denies or refuses to admit or deny without pointing to supporting evidence in the record, in violation of Local Rule 56(a)(3). *See* D. Conn. L. Civ. R. 56(a)(3) ("Each denial in Plaintiff's Local Rule 56(a)(2) Statement must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."). The rule specifically states that "Counsel and *pro se* parties are hereby notified that failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted." *Id.*

Notwithstanding Plaintiff's failure to comply with Local Rule 56(a)(3), given Plaintiff's *pro se* status, the Court has independently reviewed the summary judgment record to determine whether there is any support for Plaintiff's denials, but found only her conclusory, speculative and

6

self-serving deposition testimony alleging that Defendant backdated documents and that certain conversations did not in fact occur. (*See* Henderson Tr. at 173:10-175:11.) This is insufficient to defeat a motion for summary judgment, especially where Defendant has provided concrete evidence that refutes Plaintiff's claims. Plaintiff "cannot create a triable issue of fact merely by stating in an affidavit the very proposition [she is] trying to prove." *Hicks v. Baines*, 593 F.3d 159, 167 (2d Cir. 2010); *see also Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation") (internal quotation marks and citations omitted); *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n. 4 (2d Cir.2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor.").

Applying these principles, the Court finds the following facts established as true for purposes of this Motion:

In May 2010 Wells Fargo began to review Ms. Henderson for a HAMP loan modification for the first time. (Def.'s LR 56 ¶ 22.) On July 21, 2010, Defendant sent Plaintiff a letter requesting additional documents, including a copy of her 2008 tax returns, an extension of her 2009 tax returns and a copy of her Social Security and pension award letters, so that it could complete the HAMP review. (Def.'s LR 56 ¶ 23; Ex. A-7 (July 2010 Request for Documents Letter) to Penno Aff.) When Wells Fargo did not receive the documents, it called Ms. Henderson on July 30, 2010 to follow up on its request. (Def.'s LR 56 ¶ 24; Ex. A-4 to Penno Aff. at WF/Henderson001771.) During the call, Plaintiff informed Wells Fargo that she could not provide the documents because she had not filed her taxes. (Def.'s LR 56 ¶ 25; Ex. A-4 to Penno Aff. at WF/Henderson001771.) Wells Fargo advised Plaintiff that to qualify for a HAMP loan modification, she was required to

have filed her taxes. (Def.'s LR 56 ¶ 26; Ex. A-4 to Penno Aff. at WF/Henderson001771.) As a result, on August 4, 2010, Wells Fargo sent Plaintiff a letter notifying her that she did not qualify for a HAMP loan modification because she did not provide the documents necessary to complete the review. (Def.'s LR 56 ¶¶ 27-28; Ex. A-8 (August 4, 2010 HAMP Denial Letter) to Penno Aff.)

Additionally, Defendant avers that during the Mediation it once again reviewed Plaintiff for a HAMP loan modification. (Def.'s LR 56 ¶ 37.) Although the review was not completed during the Mediation, Defendant informed Plaintiff by letter dated May 16, 2011 once again that she did not qualify for a HAMP loan modification, this time because it was unable to create an affordable payment under HAMP. (Ex. A-9 (May 16, 2011 HAMP Denial Letter) to Penno Aff.); Def.'s LR 56 ¶¶ 37-38.)

Defendant again reviewed Plaintiff for a HAMP loan modification beginning in October 2011. (Def.'s LR 56 ¶ 51; Pl.'s LR 56 ¶ 51.) During the HAMP loan modification review process, Defendant sent Plaintiff five letters requesting additional documentation between October 2011 and March 2012 to allow a complete review. (Def.'s LR 56 ¶ 52; *see* Exs. A-11 through A-15 to Penno Aff.) These letters requested documents from Plaintiff and her claimed tenant seeking to verify and confirm Plaintiff's income and the represented rent. (*Id.* ¶¶ 53, 56-59; *see* Exs. A-11 through A-15 to Penno Aff.) On March 22, 2012, Plaintiff informed Wells Fargo that her tenant refused to provide Wells Fargo the documentation. (*Id.* ¶ 61; Henderson Tr. at 227:6-228:8, 228:24-229:2, 232:3-15.) As a result, by letter dated March 28, 2012, more than five months after the October HAMP review began, Wells Fargo informed Ms. Henderson that she did not qualify for the modification because she did not provide Defendant with the documents necessary to complete the review and Wells Fargo was not able to reach Plaintiff to discuss the review. (*Id.* ¶ 62; Ex. A-16 to Penno Aff.)

After the March 2012 HAMP denial, Defendant reviewed Plaintiff for a HAMP loan modification and non-HAMP workout option on at least two additional occasions. (*Id.* ¶ 63; *see* Ex. A-17 (June 2012 HAMP Denial Letter) to Penno Aff.; Ex. A-18 (July 2012 non-HAMP Denial Letter) to Penno Aff.) The HAMP modification was denied because Wells Fargo was unable to create an affordable payment under HAMP. (*Id.* ¶ 64; Ex. A-17 to Penno Aff.) The non-HAMP review was denied because the investor who ultimately owns the mortgage declined to modify the loan. (*Id.* ¶ 65; Ex. A-18 to Penno Aff.) Thus, in total, since March 2010, Wells Fargo reviewed Plaintiff for a HAMP loan modification on at least four separate occasions, and a non-HAMP review on at least three occasions. (Def.'s LR 56 ¶ 66.)

## II. Discussion[6]

### A. Breach of Contract

#### 1. The Forbearance Agreement is Admissible Evidence

Defendant argues that the Forbearance Agreement is inadmissible under Fed. R. Civ. P. 408 because it is the product of settlement negotiations and is being offered by Plaintiff to prove

---

[6] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

liability on her breach of contract claim. Rule 408 prohibits evidence, if offered "to prove or disprove the validity of *a disputed claim*" of "furnishing, promising, or offering–or accepting, promising to accept, or offering to accept–a valuable consideration in compromising or attempting to compromise *the claim*" as well as "conduct or a statement made during compromise negotiations about *the claim*"." Fed. R. Evid. 408 (emphasis added).  However, courts "may admit this evidence for another purpose." Fed. R. Evid. 408(b); s*ee also Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir. 1989) ("a trial court has broad discretion as to whether to admit evidence of settlement negotiations offered for 'another purpose.'").

Here, the disputed claims are Plaintiff's breach of contract, negligent misrepresentation, CUTPA and negligent infliction of emotional distress claims. Therefore, no evidence of efforts to resolve these claims through compromise or negotiation may be admitted in order to prove or disprove them.  The 2011 Forbearance Agreement is not such evidence, because even if it was the result of the Mediation, which focused on averting foreclosure, the settlement negotiations were unrelated to any of Plaintiff's claims at issue in this action, which she did not bring until 2013. Consequently, Rule 408 does not require exclusion of the Forbearance Agreement because it is offered "for another purpose" than resolving the disputed claims in this action. Thus, the Forbearance Agreement is not precluded by Rule 408 and the Court will not exclude it on this basis.

### 2.  Plaintiff Breached the Forbearance Agreement First

Plaintiff alleges that Defendant breached the Forbearance Agreement by ultimately refusing to modify her mortgage. To prevail on her breach of contract claim Plaintiff must establish: "(1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the opposing party; (4) direct and proximate cause; and (5) damages." *McMann Real*

*Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 503–04 (2006). A party cannot "recover damages under an agreement unless [she] has fully performed [her] own obligations under it." *David M. Somers & Associates, P.C., v. Busch*, 283 Conn. 396, 406 (2007); *accord Automobile Ins. Co. v. Model Family Laundries, Inc.*, 133 Conn. 433, 437 (1947). Thus, "a material breach by one party discharges the other party's subsequent duty to perform on the contract." *Weiss v. Smulders*, 313 Conn. 227, 263–64 (2014).

Here, Ms. Henderson signed and returned the Forbearance Agreement, which by its terms required her to make four monthly payments, three small payments of $304.11 and a final balloon payment of $47,556.82. (Ex. A-10 to Penno Aff. at 3.) Although Plaintiff made the first three payments, there is no dispute that she never made the final payment. Consequently, Ms. Henderson breached the Agreement first, excusing Wells Fargo from its own obligations under the contract and Plaintiff's breach of contract claim fails.

## B. Negligent Misrepresentation

Under Connecticut law, "[o]ne who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 143 (2010) (internal quotation marks omitted). "[E]ven an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth." *Id.* (internal quotation marks omitted).

The Court construes Ms. Henderson's negligent misrepresentation claim to allege that Wells Fargo represented it would modify her loan, induced her to rely on that promise knowing

it was a false promise, and as a result of her reliance, she was injured. The record could feasibly support two separate theories of liability. Under the first, Defendant led Plaintiff to believe it would modify her loan, inducing her to terminate mediation. Under the second, the Forbearance Agreement itself was the promise to modify, which induced Plaintiff to make payments to Defendant she would not otherwise have made, even though Defendant knew from the outset Plaintiff would not qualify for the loan modification. Defendant argues that Plaintiff's claim fails because the factual assertions on which the claim relies "are unsupported by any evidence from Plaintiff and directly contradicted by the summary judgment record." (Def.'s Mot. for Summary Judgment at 21.) The Court agrees and finds that Plaintiff's negligent misrepresentation claim must be dismissed under either of these theories for the reasons that follow.

Plaintiff testified that a representative of Wells Fargo called her while the Mediation was still ongoing and told her that "they had all the paperwork they needed for [her] HAMP" and that "it's all set [and] . . . [i]t will go right into underwriting." (Henderson Tr. at 186:21-187:1.) In reliance on this representation, Plaintiff then claims to have abandoned mediation. Even if Plaintiff abandoned the mediation because Defendant told her it had the necessary paperwork, Plaintiff has provided no factual basis to find that she suffered any pecuniary harm as a result of abandoning the Mediation, particularly since the outcome of any continued mediation is entirely speculative. Without proof of pecuniary harm, she cannot prove her claim of negligent misrepresentation.[7] *See Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 77–78 (2005) (holding that a plaintiff must "prove that they suffered loss as a result of these misrepresentations.").

---

[7] The Mediation was a court-ordered process in order to try and find a solution so that Defendant would not foreclose on Plaintiff's home. There was no guarantee that any particular

The theory that the Forbearance Agreement itself was a promise to modify which induced Plaintiff to make payments to Defendant despite Defendant knowing Plaintiff would not qualify for the modification is equally unavailing. Ms. Henderson cannot establish that Wells Fargo "supplie[d] false information for [her] guidance." Even if Defendant did promise to modify the loan in the Agreement, Plaintiff never made the required fourth payment, thus she cannot prove that the information in the Forbearance Agreement was false because after Plaintiff's breach, Defendant had no obligation to act under the Agreement. *See Sturm*, 298 Conn. at 143.

For these reasons, Plaintiff's negligent misrepresentation claim cannot survive summary judgment and is dismissed.

## C. CUTPA

Under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a), "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." "A party seeking to recover damages under CUTPA must meet two threshold requirements. First, he must establish that the conduct at issue constitutes an unfair or deceptive trade practice. Second, he must present evidence providing the court with a basis for a reasonable estimate of the damages suffered." *A. Secondino & Son, Inc. v. LoRicco*, 215 Conn. 336, 343 (1990) (internal citations omitted).

The Connecticut Supreme Court has identified several relevant factors to be used in determining whether a practice violates CUTPA:

(1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common

---

result would come of the Mediation and there is nothing in the record that would support finding that Plaintiff suffered any pecuniary harm as a result of her having abandoned the Mediation.

law, or otherwise . . . ; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers.

*Harris v. Bradley Mem'l Hosp. & Health Ctr., Inc.*, 296 Conn. 315, 350 (2010) (internal quotation marks omitted). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* at 350–51 (internal quotation marks omitted).

Plaintiff claims Defendant violated CUTPA by inducing her to make trial payments under the Forbearance Agreement and then refusing to hold up its end of the bargain and continuing to pursue its foreclosure action. While ordinarily a CUTPA claim cannot be based on only a breach of contract, there may be "significant aggravating circumstances" under which a party fails to perform its contractual obligations but retains the contractual benefits, which could constitute a CUTPA violation. *See Canaan Apothecary, LLC v. Salisbury Pharmacy Grp.*, LLC, No. 3:12-CV-1571 (VLB), 2014 WL 788944, at *8 (D. Conn. Feb. 25, 2014) (citing *Saturn Constr. Co. v. Premier Roofing Co.*, 238 Conn. 293, 680 (1996)). However, such a theory of CUTPA liability depends at minimum on Defendant having breached the Agreement and this claim fails for the same reasons her breach of contract claim failed–i.e., Defendant was relieved of any further contractual obligation after Plaintiff breached by failing to make the fourth payment.

Plaintiff also alleges Defendant engaged in an unfair trade practice by intentionally dragging out its processing of her request for a mortgage modification after inducing her to abandon mediation in order to increase Plaintiff's debt. However, aside from Plaintiff's own conclusory assertion that Defendant intentionally delayed, Plaintiff has produced no evidence of such conduct to support this allegation. Defendant points to its evidence that it completed seven separate loss mitigation reviews of Plaintiff's loan since March 2010, including after the mediation

14

terminated. (Def.'s LR 56 ¶¶ 66-67.) In each instance, Defendant did not grant Plaintiff a modification because she either failed to qualify, the investor declined to modify the loan, or she failed to provide the required documents to complete the review. (*See* Ex. A-9 to Penno Aff.; Ex. A-16 to *id*; Ex. A-17 to *id*.; Ex A-18 to *id*.; Def.'s LR 56 ¶¶ 37-38, 62-67.) During this time, Plaintiff never cured her default and made no payments on the mortgage loan except the three under the Forbearance Agreement. (Def.'s LR 56 ¶ 14; Pl.'s LR 56 ¶ 14.)

A further deficiency in Plaintiff's CUTPA claim is her failure to offer evidence concerning the nature and extent of the injury she claims to have sustained beyond the mortgage debt, interest and fees which accumulated because of her continuing default. *See A. Secondino & Son, Inc. v. LoRicco*, 215 Conn. 336, 344, 576 A.2d 464 (1990) ("[T]he failure to present any evidence concerning the nature and extent of the injury sustained precludes recovery under the statute."). Although Plaintiff need not "allege or prove the amount of the actual loss" *Service Road Corp. v. Quinn*, 241 Conn. 630, 638–39 (1997), she "still must marshal some evidence of ascertainable loss in support of her CUTPA allegations, and a failure to do so is indeed fatal to a CUTPA claim on summary judgment." *Marinos v. Poirot*, 308 Conn. 706, 713–14 (2013).

Finally, Plaintiff's claim that Defendant violated CUTPA by pursuing its foreclosure action while Plaintiff's application for a mortgage modification was still pending is belied by the evidence. Plaintiff was notified by letter dated August 4, 2010 that she did not qualify for a HAMP loan modification because she did not provide the documents necessary to complete the review. (Ex. A-8 to Penno Aff.; Def.'s LR 56 ¶¶ 27-28.) The foreclosure action was initiated two days later, August 6, 2010 and concluded by judgment of strict foreclosure entered August 31, 2015. (Ex. B-8 to Counsel's Aff.; Ex B-9 to *id*.) Thus, Defendant did not begin its foreclosure action until after the HAMP loan modification application was denied. Moreover, although in the cover page of the

15

Forbearance Agreement Defendant agreed to "suspend foreclosure proceedings once the initial installment ha[d] been received, and . . . continue to suspend the action as long as [Plaintiff] k[ept] to the terms of the Agreement," after Plaintiff's breach of the Agreement, Defendant was excused from this obligation and could resume its foreclosure action. Therefore, under the undisputed factual record, Plaintiff's CUTPA claim fails.

### D.  Negligent Infliction of Emotional Distress

Under Connecticut common law there are four elements to a negligent infliction of emotional distress ("NIED") claim: (1) "the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress[;] [2] the plaintiff's distress was foreseeable[;] [3] the emotional distress was severe enough that it might result in illness or bodily harm[;] and[] . . . [4] the defendant's conduct was the cause of the plaintiff's distress." *Olson v. Bristol-Burlington Health Dist.*, 87 Conn. App. 1, 5 (2005) (citing *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 446 (2003)). "[A] pivotal difference between claims for emotional distress based on intentional conduct and those based on negligent conduct" is that an NIED claim, unlike a claim for intentional infliction of emotional distress, need not be based on extreme and outrageous behavior by the defendant. *Id.* at 7.

The summary judgment record establishes that no reasonable jury could find that Defendant's conduct here created an unreasonable risk of causing Plaintiff emotional distress since it was entitled to prosecute its foreclosure action, even though the foreclosure process itself is undoubtedly distressful for the homeowner. The only remaining basis for Plaintiff's negligent infliction of emotional distress claim is that Defendant forced Plaintiff to produce hundreds of

documents and continuously assigned her new contact persons.[8] While Defendant may have conducted a frustrating loan modification process, particularly if it had an unsystematic process for requesting required documents and frequently changed the contact person for questions and follow-up, this conduct standing alone cannot create an unreasonable risk of causing severe illness or bodily harm and thus cannot support a claim for negligent infliction of emotional distress.

### III. Conclusion

For the foregoing reasons, Defendant's Motion is GRANTED. The clerk is requested to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 21st day of February 2017.

---

[8] To the extent Plaintiff bases this claim, or any other, on the fact that Defendant promised her a reverse mortgage, she cannot succeed absent any evidentiary support in the record and particularly because Plaintiff admits she never actually filed an application for a reverse mortgage. (Def.'s LR 56 ¶ 34; Pl.'s LR 56 ¶ 34; Ex. B-1 to Counsel's Aff., 188:2-4.)